Genova vs. City of Harvey

12 CV 3105

Deposition of: Eric Kellogg

Taken on: July 31, 2014

JENSEN LITIGATION SOLUTIONS
180 North LaSalle Street
Suite 2800
Chicago, IL 60601
312.236.6936
877.653.6736
www.jensenlitigation.com



Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 2 of 16 PageID #:452

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Page 1

```
 1   STATE OF ILLINOIS     )
                           )SS.
 2   COUNTY OF COOK        )

 3          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 4                    EASTERN DIVISION

 5
     JEROME P. GENOVA,              )
 6                                  )
             Plaintiff,             )
 7                                  )
         vs.                        )  No. 12 CV 3105
 8                                  )
     ERIC KELLOGG; JOSEPH LETKE;    )
 9   LETKE & ASSOCIATES, INC.,      )
     and the CITY OF HARVEY         )
10                                  )
             Defendants.            )
11
```

12

13        The deposition of ERIC KELLOGG, called by the

14   Plaintiff for examination, taken pursuant to notice and

15   pursuant to the Federal Rules of Civil Procedure for the

16   United States District Courts pertaining to the taking

17   of depositions, taken before Jori Gardner, Certified

18   Shorthand Reporter, at 30 South Wacker Drive, Suite

19   2200, Chicago, Illinois, commencing at 10:19 a.m. on

20   July 31st, 2014.

21

22

23

24

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com


JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 3 of 16 PageID #:453

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 2..5

Page 2

```
 1   APPEARANCES:
 2      WALSH LAW GROUP, P.C.
        MR. PATRICK J. WALSH
 3      30 South Wacker Drive
        Suite 2200
 4      Chicago, Illinois 60606
        Phone:  (312) 466-7683
 5      E-Mail:  pw@thewalshlawgroup.com
 6              On behalf of the Plaintiff;
 7      SMITHAMUNDSEN, LLC
        MR. STEPFON R. SMITH
 8      150 North Michigan Avenue
        Suite 3300
 9      Chicago, Illinois 60601
        Phone:  (312) 894-3395
10      E-Mail:  ssmith@salawus.com
11              On behalf of the Defendants.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1                  I N D E X
 2   WITNESS                                    PAGE
 3   ERIC KELLOGG
 4       Examination by Mr. Walsh ..........      5
 5       Examination by Mr. Smith ..........    168
 6       Further examination by Mr. Walsh ..    175
 7
                   E X H I B I T S
 8
     KELLOGG DEPOSITION EXHIBIT                 PAGE
 9
         No.  1 .............................    24
10       No.  2 .............................    24
         No.  3 .............................    25
11       No.  4 .............................    42
         No.  5 .............................    54
12       No.  6 .............................    63
         No.  7 .............................    77
13       No.  8 .............................    98
         No.  9 .............................   145
14       No. 10 .............................   147
         No. 11 .............................   150
15       No. 12 .............................   158
         No. 13 .............................   159
16       No. 14 .............................   159
         No. 15 .............................   160
17
             (Exhibits retained by Mr. Walsh.)
18
19       C E R T I F I E D   Q U E S T I O N S
20                                         PAGE  LINE
21   Do you have ........................   13    23
         a daughter?
22
23
24
```

Page 4

```
 1              I N D E X   P A G E
                    (Continued.)
 2
 3              R E D A C T E D   A N S W E R S
 4                                         Page  Line
 5   Okay.  You reside in .................   7    20
         Harvey?
 6
     Okay.  Just -- just so I'm ............  10    20
 7   clear, I mean, to me, staying
     at a hotel once in a while is
 8   not regularly.  I mean do you
     stay at another address once
 9   or twice a week or more?
10   Do you stay at any other address ......  10    23
     say one or two nights a week or
11   more than that?
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1                  (Witness sworn.)
 2   WHEREUPON:
 3                  ERIC KELLOGG,
 4   called as a witness herein, having been first duly
 5   sworn, was examined and testified as follows:
 6                  EXAMINATION
 7   BY MR. WALSH:
 8       Q.  Could you state your full name and spell your
 9   last name for the record.
10       A.  Eric J. Kellogg, E R I C, K E L L O G G.
11       Q.  And you are the mayor of Harvey, correct?
12       A.  Correct.
13       Q.  Okay.  Have you given a deposition before
14   today?
15       A.  I gave several.
16       Q.  Several.
17           Okay.  When's the last time?
18       A.  I can't recall the exact date.
19       Q.  Within the last year?
20       A.  I can't recall.
21       Q.  Okay.  Do you know if it was within two years?
22       A.  I can't recall.
23       Q.  Okay.  I'll go over a few of the instructions.
24           Make sure that all your responses are verbal
```



Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 4 of 16 PageID #:454

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 6..9

Page 6

1  rather than a nod of the head so the court reporter can
2  take everything down.
3      A.   Uh-huh.
4      Q.   If you don't understand the question that I
5  ask, just say so and I'll repeat it or rephrase it or
6  slow down or whatever I need to do to ensure that you
7  understand it.
8           It's important that we speak one at a time; in
9  conversation a lot of times people talk over one
10 another, but, again, just so the court reporter can take
11 everything down, we need to give each other a chance.
12 If you need a break, you can take a break as long as
13 there's not a question pending.
14     A.   Okay.
15     Q.   Are you under any medications today that would
16 make it difficult for you to understand or answer
17 questions?
18     A.   No, sir.
19     Q.   Okay.  Have you had any alcoholic beverages
20 within the last 24 hours?
21     A.   No, sir.
22     Q.   Okay.  What's your date of birth?
23     A.   ▇▇▇ 56.
24     Q.   When were you first elected mayor of Harvey?

Page 7

1      A.   April 2003.
2      Q.   And how many times have you been elected
3  mayor?
4      A.   Three so far.
5      Q.   And are you running in 2015?
6      A.   Yes.
7      Q.   Have you ever lost a mayor election?
8      A.   Yes.
9      Q.   In what year?
10     A.   '99.
11     Q.   And who did you run against in 1999?
12     A.   Mayor Nick Graves.
13     Q.   Does Harvey have a residency requirement for
14 its mayor?
15     A.   Not that I'm aware of.
16     Q.   So you're unaware whether the mayor is
17 required to live within the city limits?
18     A.   I've always been a resident of Harvey.
19     Q.   Okay.  You reside in Harvey?
20     A.
21     Q.   You know what, just so -- we don't -- you
22 don't have to put your exact address on the record and
23 if we can put that under seal.
24          With the political officials and police

Page 8

1  officers, we try to keep that off the record.
2      A.   Thank you.
3      MR. WALSH:  So, I don't know if you can -- we can
4  do that, put it under seal or something.
5           We don't want your personal address.
6  BY MR. WALSH:
7      Q.   Have you ever lived anywhere outside of
8  Harvey?  I know you -- be specific, a town rather than a
9  specific address.
10     A.   When I was in college.
11     Q.   Okay.  In what town?
12     A.   Bloomington, Illinois.
13     Q.   Did you go to ISU?
14     A.   Yes, sir.
15     Q.   Did you -- I'm sorry to ask these questions,
16 because I understand that your mother has passed away at
17 some point, but did you used to live with your mother?
18     A.   Yes.
19     Q.   Okay.  For how long?
20     A.   I don't know exact, you know, time.  It was --
21 I don't know exact time.
22     Q.   Was it more than a year?
23     A.   Yes.
24     Q.   Okay.  More than five years?

Page 9

1      A.   Could have been.
2      Q.   Okay.  Do you still live in the house that you
3  lived at with your mother?
4      A.   No, I reside at another house.
5      Q.   Okay.  Are you registered to vote from your
6  mother's house?
7      A.   I was registered at ▇▇▇▇▇ -- yes.
8      Q.   Okay.  And does your driver's license have an
9  address on it of a property that's owned by your
10 brother, Derrick?
11     A.   Yes.
12     Q.   Okay.  And is that the address in which you
13 currently live?
14     A.   Yes.
15     Q.   Okay.  Do you live with your brother?
16     A.   No.
17     Q.   Did you ever stay at any other address other
18 than the one that's on your driver's license?
19     MR. SMITH:  Object to the form of the question.
20          If you understand the question, you can answer
21 it in terms of where you stay.  Do you understand that?
22     THE WITNESS:  Yes.
23 BY THE WITNESS:
24     A.   The address at ▇▇▇▇▇ -- well, at my mother's



Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 5 of 16 PageID #:455

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 10..13

Page 10

1  address.
2  Q. Okay. Do you currently live alone?
3  A. Let me ask -- let me -- let me rephrase that
4  now. When you say have I lived at any other address --
5  Q. Uh-huh.
6  A. -- okay, what -- what do you mean have I --
7  because do I visit other -- other addresses or --
8  Q. Yeah, do you regularly stay at any address
9  other than the one that's on your driver's license?
10  MR. SMITH: When you say stay, what exactly do you
11  mean?
12  BY MR. WALSH:
13  Q. Spend the night.
14  A. Like a -- it could be a hotel or a -- I
15  mean --
16  Q. Okay. Just -- just so I'm clear, I mean, to
17  me, staying at a hotel once in a while is not regularly.
18  I mean do you stay at another address once or twice a
19  week or more?
20  A.
21  Q. Do you stay at any other address say one or
22  two nights a week or more than that?
23  A.
24

Page 11

1  Q. I understand. I'm asking where you would
2  stay.
3  Do you stay anywhere else; spend the night
4  more than one or two nights a week?
5  A. I mean, what -- what difference -- I mean, I
6  don't really understand the context of the question.
7  MR. SMITH: I'm going to object to relevance as
8  there is nothing in the pleadings that have anything to
9  do with the mayor's residence.
10  I'm not going to instruct the mayor not to
11  answer the question, but --
12  BY MR. WALSH:
13  Q. That's fine. We'll move on.
14  A. All right.
15  Q. Okay. I'm sorry, did you say you live alone
16  currently?
17  A. Yes.
18  Q. Okay. Other than your mother, did you ever
19  live with anybody else in your adult life?
20  A. Yeah, when I was married.
21  Q. Okay. And when were you married?
22  A. I don't know exact year, 1980, somewhere
23  around there.
24  Q. And you're no longer married?

Page 12

1  A. No, divorced.
2  Q. Okay. And what year were you divorced?
3  A. I'm not sure exact date, maybe '85, somewhere
4  around there.
5  Q. Okay. Does your former spouse work at the
6  City of Harvey?
7  A. No.
8  Q. Okay. Has she ever worked at the City of
9  Harvey?
10  A. No.
11  Q. Okay. Do you have any children?
12  A. Eric J. Kellogg, II.
13  Q. Is that your only biological child?
14  A. Eric J. Kellogg, II.
15  Q. Yes, that's your only biological child?
16  A. That's my -- my son, yes.
17  Q. You don't have any other children?
18  A. In terms of -- my son is Eric J. Kellogg, II.
19  Q. Okay. But --
20  A. You just asked me --
21  Q. I asked you do you have any children other
22  than Eric J. Kellogg, II.
23  A. Eric J. Kellogg, II, is my -- the only child
24  that I have.

Page 13

1  Q. Okay.
2  A. In terms of -- that's -- that was on my income
3  tax and the one that I supported.
4  Q. Well, I'm asking if you've ever -- do you have
5  any other biological children regardless of their -- the
6  characterization on your tax return documents, do you
7  have any other biological children?
8  MR. SMITH: That you know of.
9  BY THE WITNESS:
10  A. Eric J. Kellogg, II.
11  Q. Is what?
12  A. Is my son.
13  Q. Okay. Are you -- are you not answering the --
14  I mean --
15  A. No, I'm answering. You just asked me do I
16  have any biological kids, I said Eric J. Kellogg.
17  Q. I said -- the question is do you have any
18  biological children other than Eric J. Kellogg?
19  A. Again, I'm telling you, the biological son
20  that I have is Eric J. Kellogg.
21  Q. The only one?
22  A. Only one son, Eric J. Kellogg.
23  Q. Do you have a daughter?
24  A. Again, the only biological son that I've --

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 6 of 16 PageID #:456

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 14..17

Page 14

1  that I have is Eric J. Kellogg.
2      MR. WALSH: Okay. Just so -- I'm going to certify
3  this just for the sake of not going over it again and
4  again.
5  BY MR. WALSH:
6      Q.  Can you tell me your educational background
7  starting with high school.
8      A.  High school diploma.
9      Q.  From where?
10     A.  Thornton High School.
11     Q.  Thornton?
12     A.  Thornton, yes.
13     Q.  Okay. And in what year did you graduate?
14     A.  '74. 1974.
15     Q.  And do you have education after high school?
16     A.  Graduated from Illinois State University.
17     Q.  Okay.
18     A.  December 1979.
19     Q.  Uh-huh.
20     A.  Graduated from -- then I have a teaching
21  certificate from DePaul University.
22     Q.  Uh-huh.
23     A.  I have --
24     Q.  What year did you get the teaching

Page 15

1  certificate?
2      A.  I don't recall the exact year, maybe '80, '81.
3      Q.  Okay.
4      A.  I have a master's from National Louis
5  University.
6      MS. COURT REPORTER: You have a what?
7      THE WITNESS: I have a master's in education, I
8  believe it was 1985 from National Louis University.
9      MS COURT REPORTER: Thank you.
10 BY THE WITNESS:
11     A.  I have a Type 75, which is an administrative
12  certificate from Louis University in -- in Romeoville
13  and then I have a superintendent's endorsement from
14  Louis University in Romeoville.
15     Q.  What year did you get the administrative
16  certificate?
17     A.  I would say around 2002ish, threeish,
18  somewhere around there.
19     Q.  And what sort of administration did you study
20  there?
21     A.  It was general administration for qualifying
22  me to be a superintendent in an administration and
23  superintendent, principal, assistant principal.
24     Q.  Okay. For schools?

Page 16

1      A.  Yes.
2      Q.  Okay. And what year did you get the
3  superintendent endorsement?
4      A.  I would say from 2002, somewhere around there.
5      Q.  Okay. And as the superintendent -- or to your
6  knowledge, is the superintendent endorsement required to
7  be a superintendent of a school district?
8      A.  Yes.
9      Q.  Is the administrative certificate also a
10  requirement?
11     A.  Yes.
12     Q.  Can you tell me about employment history after
13  college.
14     A.  I was employed in School District 147 for
15  20 years as a teacher, a dean and a coach.
16     Q.  Was that in --
17     A.  School District 147.
18     Q.  Starting what year?
19     A.  I would say '81, '82, somewhere around there,
20  yeah.
21     Q.  And was it at more than one school?
22     A.  It was Rosa Parks Middle School and Dr. Martin
23  Luther King Elementary School.
24     Q.  And in what towns are those schools?

Page 17

1      A.  School District 147 is in Dixmoor and Harvey.
2      Q.  And then what did you do after you ended your
3  employment with District 147?
4      A.  I was hired in School District 152 for I think
5  13, 14 years where I retired last June 30th.
6      Q.  Okay. Just to be -- or just so that I'm
7  clear, you were in 147 from approximately '81 to 2001?
8      A.  Yes, that's correct.
9      Q.  And then District 152 from 2001 approximately
10  until June 30th of 2013?
11     A.  Yes, sir.
12     Q.  Okay. And what positions did you hold in
13  District 152?
14     A.  Director of Administrative Support Service.
15     Q.  Uh-huh.
16     A.  Assistant superintendent and superintendent.
17     Q.  And when were you the Director of
18  Administrative -- I forgot the last part of it.
19     A.  Director of Administrative Support Services.
20     Q.  Okay.
21     A.  Had to be 2003 or 2004. Yeah, 2003, 2004,
22  somewhere there.
23     Q.  And then how long were you the assistant
24  superintendent?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 7 of 16 PageID #:457

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 18..21

**Page 18**

1  A.  I believe I was assistant superintendent, I
2  believe, five, six years, superintendent three years.
3  Q.  Okay. So the five to six years, was that
4  approximately 2002 to 2008 or somewhere in that range?
5  A.  Somewhere in that range.
6  Q.  Okay. And then when you -- were you made --
7  or were you appointed superintendent in 2008?
8  A.  No, I was -- I think, it was 2010.
9  Q.  2010. Okay.
10  A.  Uh-huh.
11  Q.  All right. Have you ever been convicted of a
12  felony or misdemeanor involving dishonesty?
13  A.  No, sir.
14  Q.  Have you ever been a plaintiff or a defendant
15  in a civil matter other than this one?
16  A.  I believe as the mayor I have been involved in
17  other civil litigation.
18  Q.  Okay. Have you ever been a plaintiff in civil
19  litigation? In other words, have you ever sued anybody?
20  A.  Not that I recall.
21  Q.  And how many times have you been a defendant
22  as mayor?
23  A.  I'm not sure in terms of actual numbers.
24  Q.  Okay. How many times have you given testimony

**Page 19**

1  under oath before today?
2  A.  Somewhere in the area of five.
3  Q.  And of those five, how many of them were
4  depositions?
5  A.  Again, not giving an accurate number, I would
6  say three -- three to four, maybe.
7  Q.  Okay. And were the remaining one or two trial
8  testimony?
9  A.  The best of my recollection, I would feel safe
10  to say.
11  Q.  Have you ever had a judgment entered against
12  you in a civil matter?
13  A.  Not that I recall.
14  Q.  How about the Alex Gbur case, did you have a
15  judgment entered against you in that case?
16  A.  When you say against me, personally?
17  Q.  Yes.
18  A.  You know, I think -- if it's against the City
19  of Harvey, there was, I believe, a -- Alex Gbur was
20  awarded some money, but when you say me, personally, not
21  me, personally.
22  MR. SMITH:  I'm going to object to the form of the
23  question.
24  Do you know what judgment is, Mayor?

**Page 20**

1  BY MR. WALSH:
2  Q.  Let me clarify.
3  A.  Okay.
4  Q.  And you can correct me if I'm wrong, but in my
5  view I guess in this -- in that particular case -- a
6  judgment would be where a jury found in Alex Gbur's
7  favor and against you, personally, as mayor; so with
8  that understanding, do you know whether there was a
9  judgment entered against you in the Gbur case?
10  MR. SMITH:  If -- if you know.
11  MR. WALSH:  Every question is if he knows.
12  BY THE WITNESS:
13  A.  Again -- again -- again, when you speak in
14  specifics, with me, personally, as -- you know, because,
15  as you know, I can be sued, you know, personally and
16  then the city can be sued, so in terms of the city,
17  it's -- it's public record that they did lose that case.
18  Q.  Okay. My understanding is that official
19  capacity suits against the mayor really can't exist so
20  that the mayor is always sued individually, because the
21  mayor is the same as the city in terms of lawsuits, but
22  if you don't recall, you don't recall.
23  What is the Kel-Law Foundation?
24  A.  Oh, that was --

**Page 21**

1  MR. WALSH:  K E L, L A W.
2  BY THE WITNESS:
3  A.  A foundation that was founded by
4  Linda Allen Washington and myself probably about
5  20 years ago that's no longer in function. I haven't
6  been apart of that organization probably seven, eight
7  years and it dealt with battered and abused women and
8  children.
9  Q.  Is Linda Allen Washington a relative of yours?
10  A.  No, she's not.
11  Q.  Have you ever supported her in a political
12  campaign?
13  A.  Not that I can recall.
14  Q.  She is a trustee in Sauk Village, correct?
15  A.  Yes, sir, I believe so.
16  Q.  Did you give her any campaign donations when
17  she was running for trustee?
18  A.  Not that I can recall.
19  Q.  Do you know whether she's given you any
20  campaign donations?
21  A.  I mean, anyone who gave public donations to me
22  is public record, I'm not -- I'm not sure.
23  Q.  Are you a partner or owner of any other --
24  Strike that.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 8 of 16 PageID #:458

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 22..25

Page 22

1  I understand the Kel-Law Foundation is perhaps
2  now --
3     A.   Defunct.
4     Q.   -- defunct?
5     A.   Right.
6     Q.   Are you a partner or owner of any other
7  corporate entity?
8     A.   Not a current owner.
9     Q.   Have you been the owner or partner in another
10 corporate entity?
11    A.   If you would want to -- no, no, no.
12    Q.   No?
13    A.   No.
14    Q.   All right. Do you understand that you're
15 testifying today because you're a defendant in a lawsuit
16 filed by Jerry Genova?
17    A.   Yes, I do.
18    Q.   Okay. And do you have an understanding of the
19 allegations in the lawsuit?
20    A.   Yes, I do.
21    Q.   Okay. Can you tell me what your understanding
22 is.
23    A.   There was -- this lawsuit is -- basically
24 involves, you know, Mayor Genova and the City of Harvey

Page 23

1  through -- which he indicated that he lost his place of
2  employment for political reprisal or something to that
3  effect.
4     Q.   Have you read the complaint in this case?
5     A.   I don't believe I -- in totality I don't think
6  I have.
7     Q.   Other than your attorney, have you spoken with
8  anyone about this case?
9     A.   To the best of my recollection, no.
10    Q.   You haven't spoken with Joe Letke about the
11 case?
12    A.   The best of my recollection -- yeah, best of
13 my recollection I don't recall if I ever had any
14 conversation with Mr. Letke.
15    Q.   So other than your attorney, you don't think
16 you spoke with anybody?
17    A.   To the best of my recollection.
18    Q.   Okay. Did you review any documents to prepare
19 for today?
20    A.   In terms of today, no, I didn't.
21    Q.   Okay.
22    MR. WALSH: Do you have any stickers?
23    MS COURT REPORTER: Yeah, I have a stamp.
24    MR. WALSH: I'll stamp it for you to save time.

Page 24

1         (Kellogg Deposition Exhibit No. 1
2          marked as requested.)
3  BY MR. WALSH:
4     Q.   Showing you what I have marked as Kellogg 1.
5  Do you recognize the document?
6     A.   Let me get my glasses.
7          Yes.
8     Q.   Okay. And what do you recognize it to be?
9     A.   This is a document that was, I believe -- it's
10 too vague to really --
11    Q.   Okay.
12    A.   It's just -- it's just -- to me, it's just
13 some legislative votes that was voted on by aldermen.
14    Q.   Okay. Do you see your signature on the page?
15    A.   Yes, I do.
16    Q.   Okay. Is that your signature?
17    A.   Yes, it is.
18    Q.   And that's an accurate copy of your signature?
19    A.   Absolutely.
20    Q.   Okay. Showing you what I'm going to mark here
21 as Kellogg No. 2.
22         (Kellogg Deposition Exhibit No. 2
23          marked as requested.)
24

Page 25

1  BY MR. WALSH:
2     Q.   Take a look at the document -- oh, you know
3  what, I'll take that back. That's fine. We'll keep
4  that as Kellogg Exhibit No. 2.
5          Showing you what I'll mark as Kellogg 3.
6          (Kellogg Deposition Exhibit No. 3
7           marked as requested.)
8  BY MR. WALSH:
9     Q.   Do you recognize Exhibit No. 3?
10    A.   Yes, I do.
11    Q.   Okay. And what do you recognize it to be?
12    A.   Interrogatory.
13    Q.   Okay. And did you provide the information
14 that was used to create Exhibit No. 3?
15    A.   Yes.
16    Q.   And you see the signature on the last page?
17    A.   Yes.
18    Q.   Okay. Would you agree that it looks different
19 than the signature in Exhibit 1?
20    A.   All my signatures look different.
21    Q.   They do?
22    A.   Yes.
23    Q.   Okay. So is this your signature in the last
24 page of Exhibit 3?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 9 of 16 PageID #:459

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 26..29

Page 26

1   A.   Yes, it is.
2   Q.   Are you familiar with -- and don't be insulted
3  by the question, I just have get a clear record.
4        Are you familiar with the form of government
5  and the function of the government in Harvey between
6  2008 and 2011?
7   A.   Yes, sir.
8   Q.   Okay. As a mayor and city council?
9   A.   Yes, sir.
10  Q.   Is it home rule?
11  A.   Yes, sir.
12  Q.   And was the governmental structure the same
13 between 2008 and May of 2010?
14  A.   Yes.
15  Q.   Does the City of Harvey have a city manual for
16 employees?
17  A.   Yes, I believe so, yes.
18  Q.   Okay. And do you know what it's called?
19  A.   City manual.
20  Q.   Okay. And are you required to be familiar
21 with its contents?
22  A.   Each employee should be familiar with the
23 contents associated with the particular manual.
24  Q.   Okay. Are you familiar with the contents?

Page 27

1   A.   Again, I'll probably peruse it, but I'm -- I'm
2  sure that if I had to see it again, I would -- I would
3  be able to recite some things from it.
4   Q.   Okay. Does Harvey have a policy in that
5  manual on political discrimination?
6   A.   I believe so.
7   Q.   And do you know what that policy states?
8   A.   I wouldn't be able to give you a verbatim, but
9  I believe that any municipality or organization should
10 have a policy relative to discrimination.
11  Q.   Including political?
12  A.   Political, sexual, whatever, you know.
13  Q.   Okay. I want to talk a little bit about your
14 duties as mayor.
15  A.   Yes.
16  Q.   Tell me, generally, what are your duties as
17 mayor?
18  A.   Well, it's a part-time position.
19  Q.   Uh-huh.
20  A.   My job is to oversee the day-to-day operations
21 of the city.
22  Q.   Okay.
23  A.   To work in concert with my department heads to
24 make sure that the residents are being provided city

Page 28

1  services.
2   Q.   Do you work out of City Hall?
3   A.   Some days. Some days I work throughout the
4  city.
5   Q.   Okay. Do you mean out --
6   A.   In the community.
7   Q.   Out in the field --
8   A.   Yes, sir.
9   Q.   -- so to speak?
10  A.   Uh-huh.
11  Q.   Okay. And how many hours do you work per week
12 as mayor?
13  A.   I couldn't put an exact time on it cause from
14 the time I wake up -- if I'm at the track in the morning
15 jogging and residents are there, then I'm working.
16       I'm severing 'til 10:00, 11:00 o'clock so I
17 couldn't put an exact -- you know, I work for the people
18 so I can't really put a time limit on it.
19  Q.   Do you have any other employment?
20  A.   Currently, again, I just retired from the
21 superintendency.
22  Q.   Okay. Do you have any other employment
23 currently?
24  A.   Yes, I -- I'm on staff as a Dixmoor Police --

Page 29

1  part-time police.
2   Q.   Okay. And what hours do you work as a
3  part-time police officer in Dixmoor?
4   A.   Well, again, I'm part-time.
5   Q.   Uh-huh.
6   A.   And based -- it's on -- you know, on my
7  schedule with -- as the mayor, you know, so...
8   Q.   Okay. When's the last time you worked as a
9  part-time police officer in Dixmoor?
10  A.   I don't recall the exact date. I don't recall
11 the exact date.
12  Q.   Was it in July?
13  A.   It could have been. I'm not sure of the exact
14 date.
15  Q.   Okay. Are you paid there hourly or salary?
16  A.   It's -- it's hourly and it's a minimal -- I
17 think it's like $12 an hour or something like that.
18  Q.   Okay. And do you have to punch in and punch
19 out?
20  A.   Yes, sir.
21  Q.   And do you get a police car from Dixmoor?
22  A.   No, sir.
23  Q.   Are you uniformed when you work there?
24  A.   Yes, sir.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 10 of 16 PageID #:460

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 30..33

Page 30

1  Q. And when's the last time you made an arrest in
2  Dixmoor?
3  A. I can't recall.
4  Q. In 2014?
5  A. I can't recall.
6  Q. Do you know if -- in 2013?
7  A. I can't recall.
8  MR. SMITH: Object, object. Asked and answered.
9  He answered the question three times.
10 BY MR. WALSH:
11 Q. I asked him 2014.
12 A. I can't recall.
13 Q. And then I asked you about 2013.
14 A. I can't recall.
15 Q. Okay. Do you ever recall making an arrest in
16 Dixmoor?
17 A. I can't recall.
18 Q. When were you appointed a part-time police
19 officer in Dixmoor?
20 A. Probably when I became a state certified
21 police officer, right after that. I would say within a
22 year. Probably seven, eight years ago.
23 Q. Okay.
24 A. I don't have the exact date, but I'm sure it's

Page 31

1  public record.
2  Q. Do you have any paid employment other than
3  mayor and part-time police officer in Dixmoor?
4  A. That's it.
5  Q. Do you have any sources of income other than
6  those two positions?
7  A. I have my retirement and the mayor.
8  Q. Well, we talked about mayor, we talked about
9  Dixmoor, and you have retirement from the
10 superintendent's position; is that right?
11 A. School district.
12 Q. School district.
13 A. Yes.
14 Q. Any sources of income other than that?
15 A. No.
16 Q. Other than what you already testified to, have
17 you had other jobs since you were elected mayor in 2003?
18 A. Not that I recall.
19 Q. Harvey has a city clerk, correct?
20 A. Correct.
21 Q. Who is that?
22 A. Nancy Clark.
23 Q. Is that an elected position?
24 A. Yes.

Page 32

1  Q. Do you know if Ms. Clark is a democrat or
2  republican?
3  A. I wouldn't know.
4  Q. Do you know if she ran on a ticket with anyone
5  else?
6  A. I wouldn't know. I can't recall. To be
7  honest with you, I can't recall.
8  Q. Have you ever done political work for
9  Ms. Clark?
10 A. I can't recall.
11 MR. SMITH: Object to the form of the question.
12        Political work, what exactly do you mean?
13 MR. WALSH: Anything to assist her political goals.
14 BY THE WITNESS:
15 A. I can't recall if I have.
16 Q. You don't recall one way or the other?
17 A. No.
18 Q. Have you ever made a political contribution to
19 Ms. Clark?
20 A. I don't recall ever making a contribution to
21 Ms. Clark. I don't recall that.
22 Q. You don't recall one way or the other?
23 A. No.
24 Q. Do you know whether Ms. Clark has made a

Page 33

1  political contribution to you or your campaigns?
2  A. I'm not sure.
3  Q. And do you know when Ms. Clark was first
4  elected?
5  A. Possibly in 2007 or '08.
6  Q. Okay.
7  A. Yeah.
8  Q. And she's been a clerk continuously since
9  then?
10 A. Yes.
11 Q. Do you have an assistant?
12 A. Yes.
13 Q. And who is that?
14 A. Drenia Lewis.
15 Q. And who is Drenia Lewis; is she related to
16 you?
17 A. Yes.
18 Q. Is she your sister?
19 A. Yes.
20 Q. And is -- was she appointed to that position?
21 A. By me?
22 Q. By anybody.
23 A. Yes.
24 Q. Okay. Was it by you?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 11 of 16 PageID #:461

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 34..37

Page 34

1    A.   Yes.
2    Q.   And how long has she been your assistant?
3    A.   Since 2003.
4    Q.   And does she have a full-time position?
5    A.   Yes.
6    Q.   And what are Ms. Lewis' duties?
7    A.   She works with the department heads, works
8 with the residents of the City of Harvey. She fills
9 various complaints. She holds department head meetings
10 and just a plethora of things.
11    Q.   Has Ms. Lewis ever done political work for
12 you?
13    A.   Yes.
14    Q.   And what sort of political work has she done
15 for you?
16    A.   Manned my campaign office.
17    Q.   Have you always had the same campaign office
18 since you -- Strike that.
19      I believe you said you first ran for mayor in
20 1999, correct?
21    A.   Correct.
22    Q.   And did you have a campaign office then?
23    A.   Yes.
24    Q.   And do you have the same campaign office

Page 35

1 today?
2    A.   No.
3    Q.   Okay. Do you have a golf outing --
4    A.   Yes.
5    Q.   -- each year?
6      And does Ms. Lewis run the golf outing?
7    A.   She works with the golf outing in terms of
8 overseeing the entire golf operations. There's a
9 committee that's associated with that.
10    Q.   Is the golf outing a Harvey event or is that a
11 political event for you?
12    A.   It's a political event.
13    Q.   Do you know whether Ms. Lewis has ever made a
14 political contribution to your campaigns?
15    A.   I'm not sure.
16    Q.   Do you know whether Ms. Lewis has ever run for
17 office herself?
18    A.   Not that I know of.
19    Q.   Who is the city attorney in Harvey?
20    A.   Bettie Lewis.
21    Q.   And is Ms. Lewis your niece?
22    A.   Yes.
23    Q.   And did you appoint her as city attorney?
24    A.   Yes.

Page 36

1    Q.   In what year?
2    A.   2003.
3    Q.   And was she an attorney at the time you
4 appointed her?
5    A.   Yes.
6    Q.   Okay. Do you know what year she graduated
7 from law school?
8    A.   I don't know the exact year. Maybe 2002, I
9 don't -- again, I'm -- I'm not sure, but she was a full
10 fledged attorney graduate of Northwestern -- I'm sorry,
11 Wisconsin and Northern Law School.
12    Q.   Okay. And she --
13    A.   So she was qualified.
14    Q.   I understand.
15      And I believe you said -- you estimated or you
16 thought perhaps she graduated from law school in 2002?
17    A.   She was an attorney --
18    Q.   Right.
19    A.   -- when she -- when I hired her.
20    Q.   And don't get me wrong, I'm not -- I'm not
21 claiming that she wasn't an attorney --
22    A.   I don't know -- I don't know the exact date in
23 terms of -- but I knew she was a full fledged attorney
24 when she was hired.

Page 37

1    Q.   Do you know if she had any prior working
2 experience as an attorney before you appointed her city
3 attorney?
4    MR. SMITH: Object to the form of the question and
5 I object based on relevance, but if you know about
6 Ms. Lewis' qualifications or experience as an attorney
7 before she became corporation counsel for Harvey, you
8 can testify to that.
9 BY THE WITNESS:
10    A.   Well, I can only speak from a knowledge
11 perspective.
12    Q.   From what prospective?
13    A.   Oh, from a very knowledge prospective relative
14 to the -- the very grueling process that you attorneys
15 go through. I'm sure that you receive a wealth of
16 experience during your educational, you know, curriculum
17 so I'm sure that you've probably seen all forms of
18 political -- I'm sorry, legal aspect in -- in your
19 aspiration to become an attorney, so based on that and
20 her qualifications and the fact that she passed the bar
21 to be a full fledged attorney, just speaking on that,
22 I'm sure that she's well equipped to handle the nuances
23 of her position.
24    Q.   Do you know what her qualifications were other

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com


JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 12 of 16 PageID #:462

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 38..41

Page 38

1  than having passed the bar exam?
2     MR. SMITH: Object to the form of the question.
3  BY MR. WALSH:
4     Q.  Well, let me ask you this, do you know if she
5  had any prior working experience before you appointed
6  her city attorney?
7     MR. SMITH: Object to the form of the question.
8  Working as a lawyer --
9     MR. WALSH: Yes, working as a lawyer.
10    MR. SMITH: -- not working as a lawyer?
11 BY MR. WALSH:
12    Q.  Working as a lawyer.
13    A.  Prior to becoming a lawyer she couldn't have
14 worked as a lawyer. I mean, I just know that she was a
15 qualified individual who passed the bar and was -- you
16 know, has been doing a tremendous job for the city.
17    Q.  Okay. And I don't mean to harp on it, but I
18 just want to make sure we're clear, do you know whether
19 she had any work experience as an attorney before you
20 appointed her as city attorney?
21    A.  I can only -- I can only speak on the fact
22 that she was a very competent, qualified, integral part
23 of my establishment.
24    Q.  Did she give you a resumé?

Page 39

1     A.  Again, I can only speak to the fact that she
2  was competent and she's qualified and at the time -- you
3  know, she was quantified and qualified as an attorney.
4     Q.  And do you know whether she gave you a resumé?
5     A.  2003 -- I'm sure she probably presented a
6  portfolio, but, again, I can't recall if it was a
7  portfolio or if it was a resumé, I can't recall.
8     Q.  Okay. Does Ms. Lewis have an office at City
9  Hall currently?
10    A.  Yes.
11    Q.  And does she work full-time for Harvey?
12    A.  She's our corporate counsel.
13    Q.  Is that a full-time position?
14    A.  Yes, it is.
15    Q.  Okay. And does that position pay $170,000?
16    A.  Somewhere in that area.
17    Q.  Okay. And she also works for the firm that's
18 representing you in this case, correct?
19    A.  Yes, sir.
20    Q.  Okay. Do you know whether she works full-time
21 for that firm also?
22    A.  Well, let -- let me just say in terms of her
23 full and part-time association with -- you know, her
24 firm -- all I know is that she's corporate counsel, in

Page 40

1  terms of her affiliation with the -- with the firm that
2  she's currently with, I can't address that.
3     Q.  Okay. You don't ever speak to her about that?
4     A.  No, I don't.
5     Q.  Has she ever done political work for you?
6     A.  I'm trying to --
7     MR. SMITH: I'll object to the form of the
8  question.
9     What exactly do you mean by political work?
10    MR. WALSH: Anything to further the mayor's
11 political goals, campaigns, fundraising, anything.
12 BY THE WITNESS:
13    A.  Again, she's attended some of my fundraisers.
14    Q.  She has?
15    A.  The golf outing I'm sure.
16    Q.  Okay. Does she help run the golf outing?
17    A.  She was probably on the committee.
18    Q.  Okay. And that's a political fundraising
19 event, correct?
20    A.  Yes.
21    Q.  Okay. Do you know if she's ever collected
22 signatures for you?
23    A.  I'm not sure.
24    Q.  Do you know any other political work that

Page 41

1  she's done for you other than the golf outing?
2     A.  I'm not sure.
3     Q.  Do you know if she's ever made a donation to
4  your campaign?
5     A.  I'm not sure.
6     Q.  How many department heads are there in Harvey?
7     A.  There's the police, the fire --
8     Q.  Uh-huh.
9     A.  -- the street department and the water
10 department, which is combined.
11    Q.  Streets and water are combined?
12    A.  Yeah, they're combined.
13    Q.  Okay.
14    A.  And then we have the planning department.
15    Q.  Anyone else?
16    A.  That's -- that's it.
17    Q.  How about the comptroller, is that a
18 department head?
19    A.  I wouldn't necessarily say it's a department
20 head, but the comptroller, you know, serves as -- you
21 know, comptroller for the city and handles all the
22 business matters of the city.
23    Q.  Let me show you what I'm going to mark as
24 Kellogg 4.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 13 of 16 PageID #:463

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 42..45

### Page 42

1  (Kellogg Deposition Exhibit No. 4
2  marked as requested.)
3  BY THE WITNESS:
4  A.  Like I said, he's a comptroller.
5  Q.  Do you recognize Exhibit 4?
6  A.  Yes, I do.
7  Q.  And is this a memorandum created by you or for
8  you?
9  A.  Yes.
10  Q.  Okay. And which -- do you know if you
11  actually created this memorandum or if someone did it
12  for you?
13  A.  I can't recall.
14  Q.  Is it your policy and practice to type your
15  own memorandums or do you have someone do that for you?
16  A.  Generally someone else, uh-huh.
17  Q.  This says -- this quotes a -- I'm very sorry.
18  This quotes a section of the municipal code
19  about the comptroller position, correct?
20  A.  Yes.
21  Q.  Okay. And it says there is created -- is
22  that -- now, the municipal code, is that the Illinois
23  Municipal Code?
24  A.  Yes.

### Page 43

1  Q.  Okay. And it says there is created the office
2  of the city comptroller who shall be the head of the
3  department of finance.
4  A.  Okay.
5  Q.  Is that correct -- that's correct?
6  A.  Yes.
7  Q.  Okay. So would that mean that he is a
8  department head?
9  A.  I said he was a comptroller, yes, I did. I
10  stated that in my testimony.
11  Q.  He is a department head, the comptroller?
12  A.  Again, based on this document, the comptroller
13  who was considered management and in control of all the
14  financial matters.
15  Q.  And how about a department head, yes or no?
16  MR. SMITH:  I'm going to object to the form of the
17  question.
18  BY THE WITNESS:
19  A.  He's the comptroller.
20  MR. SMITH:  The document speaks for itself.
21  MR. WALSH:  Okay. Well, I don't think that's an
22  objection. I'm asking him whether the comptroller is a
23  department head.
24

### Page 44

1  BY THE WITNESS:
2  A.  Yeah, he was the comptroller.
3  Q.  The question is --
4  A.  Which is consistent with the document.
5  Q.  Is the comptroller a department head?
6  A.  It's a -- it can be considered a separate
7  department.
8  Q.  And then is the comptroller a department head?
9  A.  Based on this document, I would say that he's
10  the head of his particular department.
11  Q.  Okay. And would you consider that a
12  department head?
13  A.  I would consider him the head of that
14  department -- of the finance department.
15  Q.  Okay. And as mayor, do you appoint the
16  department heads?
17  A.  Yes --
18  Q.  And --
19  A.  -- with the consent of the council.
20  MS. COURT REPORTER:  With the what?
21  THE WITNESS:  Consent of the council.
22  BY MR. WALSH:
23  Q.  Do all the department head appointments
24  require consent of the council?

### Page 45

1  A.  I believe so, yes.
2  Q.  Your police chief is Denard Eaves, correct?
3  A.  Yes.
4  Q.  And he's acting chief, correct?
5  A.  Correct.
6  Q.  And he's been acting chief since 2007?
7  A.  Yes.
8  Q.  Did you -- were you required to get consent of
9  the council even though he was just acting chief or does
10  that allow you to appoint him without getting consent
11  from the council?
12  A.  If he was ever brought to the city council for
13  confirmation, then he would be -- he would get the
14  consent of council.
15  Q.  But because he's acting chief, are you not
16  required to get the consent of the council?
17  A.  It's my understanding that he's going to be
18  brought to the council as the permanent chief, then he
19  would -- then there would be a need for a consent.
20  Q.  Okay. Has Denard Eaves ever performed
21  political work for you?
22  MR. SMITH:  Again, I'm going to object to the form
23  of the question as to what political work means.
24  MR. WALSH:  Okay.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 14 of 16 PageID #:464

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 46..49

**Page 46**

1  MR. SMITH: If you understand the question --
2  THE WITNESS: Right.
3  MR. SMITH: -- you can answer.
4  BY THE WITNESS:
5  A.  I'm sure that if he's -- he probably
6  participated in some fundraising activities.
7  Q.  Okay. How about collecting signatures?
8  A.  I'm not sure.
9  Q.  How about going door to door?
10  A.  He might have, I'm not -- I can't recall.
11  Q.  Have you ever asked him if he's done political
12  work for you?
13  A.  I don't recall ever having a conversation.
14  Q.  You ever see him at your campaign office?
15  A.  Yes.
16  Q.  Okay. And during election season?
17  A.  Yes.
18  Q.  Okay. And in what years?
19  A.  I don't recall the exact years, but I have saw
20  him -- seen him at my campaign office.
21  Q.  And has Denard Eaves ever made a political
22  contribution to you?
23  A.  I'm not sure.
24  Q.  Who is the fire chief?

**Page 47**

1  A.  Jason Bell.
2  Q.  B E L L?
3  A.  Yes.
4  Q.  Bell.
5     And how long has Chief Bell been your fire
6  chief?
7  A.  Probably four, five years.
8  Q.  And has Chief Bell ever done political work
9  for you?
10  MR. SMITH: Same objection to the form of the
11  question as the terms political work are not defined.
12     If you understand the question, you can
13  answer.
14  THE WITNESS: Right.
15  BY THE WITNESS:
16  A.  I'm not sure in terms of -- there's
17  religious -- I think he's a Jehovah's witness so I
18  don't -- I can't recall if -- you know, due to the fact
19  that it was religion -- I know he's a Jehovah's witness
20  and his family so I don't know if, in fact, he was
21  involved in any political work. I can't recall any
22  political work.
23  Q.  Have you ever seen him at your campaign
24  office?

**Page 48**

1  A.  I can't -- due to his religion, I don't -- I
2  can't recall. It's a shame, but I can't recall.
3  Q.  Who is the head of streets and water?
4  A.  Superintendent Rufus Fisher.
5  Q.  And how long has Mr. Fisher been the
6  department head of streets and water?
7  A.  2003.
8  Q.  Are you related to Rufus Fisher?
9  A.  No, sir.
10  Q.  And has Rufus Fisher ever done political work
11  for you?
12  A.  Yes, sir.
13  Q.  Okay. And what sort of work has he done?
14  A.  Probably passing out fliers or something.
15  Q.  Do you know whether Mr. Fisher has ever made a
16  political contribution to you?
17  A.  I'm not sure.
18  Q.  Have you ever seen him at your campaign
19  office?
20  A.  Yes, sir.
21  Q.  In what years?
22  A.  I can't recall the exact years.
23  Q.  And who's the head of planning?
24  A.  LaTanya Rufus.

**Page 49**

1  Q.  And how long has Ms. Rufus been the head of
2  planning -- or planning, yes.
3  A.  I believe she came in maybe 2004, 2005. I'm
4  not exactly sure of the year that she came in and then
5  she took -- she left and took another job and there was
6  a break in service.
7  Q.  Sorry.
8  A.  But I believe maybe 2005, somewhere in that
9  area.
10  Q.  Okay. Are you related to Ms. Rufus?
11  A.  No, sir.
12  Q.  How did you meet her?
13  A.  I don't recall how we met.
14  Q.  Has Ms. Rufus ever done political work for
15  you?
16  MR. SMITH: Same objection.
17  BY THE WITNESS:
18  A.  She more than likely -- yeah, she's probably
19  done some political work.
20  Q.  Okay. In what -- in what form?
21  A.  I'm not sure exactly what form, but maybe
22  attending the golf outing or things of that nature.
23  Q.  Do you know if she's ever made a campaign
24  donation to you?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 15 of 16 PageID #:465

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 50..53

Page 50

1   A.  I'm not sure, but it's all public -- public
2   record.
3   Q.  Have you ever seen her at your campaign
4   office?
5   A.  I believe so.
6   Q.  I'm sorry?
7   A.  I believe so.
8   Q.  In what years?
9   A.  I'm not sure of the years.
10  Q.  And how about -- but do you have any relatives
11  that work for Harvey?  I'm sorry, other than what you
12  testified to.  I believe you said Drenia Lewis is your
13  sister, Bettie Lewis is your niece.
14  A.  Uh-huh.
15  Q.  Do you have any other relatives that work at
16  Harvey?
17  A.  Derrick Muhammad.
18  Q.  Okay.  And he's your brother?
19  A.  Yes.
20  Q.  Any others?
21  A.  Not that I can think of at this point.  Not
22  that I can recall at this point.  Let me see.
23      Okay.  Go ahead.
24  Q.  What was your answer?

Page 51

1   A.  At this point I can't recall any -- I mean,
2   I'm trying to think.
3       I'll come back to that, let me just --
4   Q.  Okay.
5   A.  I got to peruse the different departments, you
6   know.
7   Q.  That's fine.
8   A.  Okay.
9   Q.  Okay.  And then Joseph Letke, he was the
10  comptroller, correct?
11  A.  Correct.
12  Q.  And in what year was he -- Strike that.
13      Did you appoint him comptroller?
14  A.  I believe I appointed him with the council's
15  approval.
16  Q.  Okay.  In what year?
17  A.  Maybe 2008, '07 or something.  I'm not exactly
18  sure what -- I believe it was 2008, yeah.
19  Q.  And did Joseph Letke ever make campaign
20  contributions to you before you appointed him
21  comptroller?
22  A.  No, any campaign donations that Mr. Letke
23  provided to me is all public record.
24  Q.  And that may be true, but my question is did

Page 52

1   he ever make a campaign contribution to you before you
2   appointed him as comptroller?
3       MR. SMITH:  I'm going to object to the form of the
4   question.
5       If you know.
6       MR. WALSH:  Every question is if he knows.  I mean,
7   I kind of think that's coaching in a way, right?  That's
8   not an objection.
9       MR. SMITH:  I'm not coaching.
10      MR. WALSH:  Then what was the point of saying if
11  you know.  Every single question here is if you know.
12      MR. SMITH:  Well, you're asking him if somebody
13  who's a party to this case made a campaign donation.
14      MR. WALSH:  Yeah.
15      MR. SMITH:  In order for him to know that,
16  respective to Letke and the other individual, he would
17  actually have to see them making a donation.
18      MR. WALSH:  Or just say I don't know.
19      MR. SMITH:  Well --
20      MR. WALSH:  He can say I know or I don't know.
21      MR. SMITH:  Well, what he can say is --
22  BY THE WITNESS:
23  A.  I said it was all public record.
24      MR. SMITH:  It's all public record.

Page 53

1       MR. WALSH:  I understand that, but I want to know
2   if he knows.
3       MR. SMITH:  Well, the issue is -- the issue here is
4   is we're not going to give testimony that's contrary to
5   public record, so that's off the table if that's what
6   you're looking for.
7       MR. WALSH:  I'm looking to just --
8       MR. SMITH:  We're not going to --
9       MR. WALSH:  I'm looking for what he knows.  I'm not
10  looking for contrary, I'm not looking for consistent
11  with, I'm just looking for what your client knows about
12  whether Joseph Letke made campaign contributions before
13  he was appointed comptroller.
14      MR. SMITH:  Yeah, any -- any questions related to
15  political contributions are public record.
16      MR. WALSH:  I understand that.
17      MR. SMITH:  And if the mayor doesn't have a list
18  with checks and balances who gave him contributions, the
19  only thing that he can tell you is that any political
20  contributions are in the records of the State Board of
21  Elections.
22      MR. WALSH:  That's not the only thing he can tell
23  me.  I'm asking what he knows, right?
24      If somebody asked me is Chicago in the State

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-1 Filed: 08/21/14 Page 16 of 16 PageID #:466

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 54..57

Page 54

1  of Illinois, I can say go look in the dictionary. It's
2  in the dictionary, right, but I know that Chicago is in
3  the State of Illinois, so what I trying to do is test
4  his knowledge, not have him direct me to a public
5  record.
6      MR. SMITH: Right.
7      MR. WALSH: Fair enough.
8  BY THE WITNESS:
9      A.   I can only tell you that anyone who makes
10 contributions to my campaign office is matter of public
11 record. I don't know. That's all.
12     Q.   Do you know whether Joseph Letke was your
13 largest campaign contributor before you appointed him as
14 comptroller?
15     A.   I'm -- I'm not sure.
16     Q.   I'll show you what I'll mark as Kellogg 5.
17              (Kellogg Deposition Exhibit No. 5
18              marked as requested.)
19     MR. SMITH: Thank you.
20 BY MR. WALSH:
21     Q.   Do you recognize Exhibit No. 5?
22     A.   Yes, I do.
23     Q.   And what do you recognize it to be?
24     A.   It's a document which indicates various donors

Page 55

1  to my campaign.
2      Q.   Actually, it shows donations.
3      A.   Right.
4      Q.   The donations that Joseph Letke made.
5      A.   Oh, these are -- okay.
6      Q.   And on Page 2 at the bottom, in 2004 there was
7  a contribution made of $5,000; do you see that? Bottom
8  of Page 2.
9      A.   Yes.
10     Q.   Okay. Were you running for office in 2004?
11     A.   I think -- you know, campaign -- I mean, do
12 you have to be running for office for individuals to
13 donate?
14     Q.   I don't know that.
15          So I'm asking you though, were you running for
16 office in 2004?
17     A.   I'm always gearing up to run for office.
18     Q.   Okay. So what office were you gearing up to
19 run for in 2004?
20     A.   Apparently for reelection.
21     Q.   And what year was the election?
22     A.   What -- 2007.
23     Q.   Okay. And what month was the 2003 election?
24     A.   April.

Page 56

1      Q.   Did you have any business -- or did you do any
2  business with Joseph Letke between 2004 and 2008?
3      A.   Didn't.
4      Q.   Did he do any work for Harvey that you know of
5  between 2004 and 2008?
6      A.   I'm not -- I'm not sure.
7      Q.   Did you have any business relationship with
8  Joseph Letke between 2004 and 2008?
9      A.   Business relationship, what -- what do you
10 mean?
11     Q.   In any private business, in public sector, any
12 business relationship.
13     A.   There was no business relationship.
14     Q.   Did you know Joseph Letke between 2004 and
15 2008?
16     A.   I believe so.
17     Q.   Okay. And how did you meet?
18     A.   Can't recall how we met and where we met.
19     Q.   Did you ever socialize with Joseph Letke
20 between 2004 and 2008?
21     MR. SMITH: Object to the form of that question,
22 socialize.
23          How are we defining socialize?
24

Page 57

1  BY MR. WALSH:
2      Q.   You ever go to dinner, go to lunch, play golf?
3      A.   No, I can't recall that particular, you know,
4  association.
5      Q.   Did you ever speak on the phone with
6  Joseph Letke between 2004 and 2008?
7      A.   I can't recall if I did.
8      Q.   Do you know if Joseph Letke did any political
9  work for you between 2004 and 2008?
10     A.   I can't recall.
11     MR. SMITH: Same objection.
12 BY MR. WALSH:
13     Q.   What's that?
14     A.   No, I can't recall.
15     Q.   You don't recall one way or the other?
16     A.   No.
17     Q.   Did you ever see him at your campaign office
18 between 2004 and 2008?
19     A.   I can't recall if I've ever seen him at my
20 campaign office.
21     Q.   You don't recall one way or the other?
22     A.   No, I can't recall.
23     Q.   Were you an alderman -- is it called an
24 alderman or council member at Harvey?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions