Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 1 of 16 PageID #:467

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 58..61

Page 58

1  A.  Alderman.
2  Q.  Okay. And were you an alderman at Harvey?
3  A.  Yes.
4  Q.  In what years?
5  A.  It was 20-- -- I believe, '01 through 2008, I
6  believe.
7  Q.  I'm sorry, you said 2001 to 2008?
8  A.  I said 2001 through 2008 because it was two
9  full year terms, I believe.
10 Q.  That you were an alderman? Weren't you mayor,
11 too?
12 A.  No, I'm sorry, I'm sorry, it was '99 or '96.
13 I want to say '96 to 2000 or --
14 Q.  You were mayor in 2003, right?
15 A.  No, let me see.
16     '99 I ran -- so, no, it had to be '90 to 91
17 to -- yeah, '91 to '95 and '95 to '99, yeah, those are
18 the correct dates.
19 Q.  Okay. Alderman from '91 to '99?
20 A.  Right.
21 Q.  And what did you do between '99 and 2003
22 politically, did you hold an office?
23 A.  Not -- no.
24 Q.  Were you assistant superintendant during those

Page 59

1  years?
2  A.  Yes.
3      From '91 to '99 I was the alderman.
4  Q.  Uh-huh.
5  A.  Okay. '99 I ran for mayor and I was
6  unsuccessful.
7  Q.  Uh-huh.
8  A.  And then in four -- four years, during that
9  time, I was basically just working in the community.
10 Working with the children and getting prepared the 2003
11 election.
12 Q.  Was the '99 election close?
13 A.  Extremely close.
14 Q.  Okay.
15 A.  I think like 300 votes or something like that.
16 Q.  Out of how many total do you recall
17 approximately?
18 A.  I don't recall the exact number.
19 Q.  Was it an expensive campaign?
20 A.  I don't recall how much it was.
21 Q.  Do you know how many people typically work on
22 your mayoral campaign?
23 A.  I don't recall the exact number.
24 Q.  Is it more than 50?

Page 60

1  A.  I couldn't say.
2      I'm too busy campaigning to be honest with
3  you.
4  Q.  Okay. To know how many people are working on
5  the campaign?
6  A.  Right.
7  Q.  Do your campaign workers collect signatures?
8  A.  Some do.
9  Q.  Okay. Do they go door to door trying to get
10 people to vote?
11 A.  It's a variety of methods in terms of, you
12 know, door to door, various businesses. You know,
13 looking for Harvey residents.
14 Q.  You don't make phone calls to residents?
15 A.  From the political office they certainly make
16 phone calls.
17 Q.  Conduct fundraisers?
18 MR. SMITH:  Is that a question?
19 MR. WALSH:  Yes.
20 BY MR. WALSH:
21 Q.  Is one of the activities that the campaign
22 workers do is conduct fundraisers?
23 A.  There's a committee that sets up the
24 fundraisers.

Page 61

1  Q.  And who's on that committee?
2  A.  I don't recall exactly who's on the fundraiser
3  because it's an ever changing committee.
4  Q.  Doe that committee have a nickname?
5  A.  I'm not sure.
6  Q.  Okay. Was Drenia Lewis on that committee?
7  A.  She had some affiliation with it. I don't
8  know if she was exactly on the committee.
9  Q.  Was Bettie Lewis on that committee?
10 A.  She had some affiliation, I'm not sure if she
11 was exactly on the committee.
12 Q.  Do you know Sandra Alvarado?
13 A.  Yes, I do.
14 Q.  Okay. Was she on the committee?
15 A.  She served on the committee, I believe.
16 Q.  And Sandra Alvarado was the assistant to the
17 chief of police?
18 A.  Yes, sir.
19 Q.  And the PR director for Harvey?
20 A.  Yes, sir.
21 Q.  For about 14 years?
22 A.  Seems like that term could be correct.
23 Q.  Okay. And did Ms. Alvarado -- other than her
24 participation on that committee, did she do political

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 2 of 16 PageID #:468

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 62..65

Page 62

1 work for you?
2    A. She did some political work, uh-huh.
3    Q. You ever see her at your campaign office?
4    A. Yes.
5    Q. Other than the people that you've already
6 discussed, how many employees at the City of Harvey do
7 you know that have performed political work for you?
8    A. I really couldn't give you an accurate number
9 because, you know, I really don't actively, you know --
10 you know, a lot of individuals say they working for you,
11 but you can't really, you know, give like -- that's not
12 an accurate gauge.
13    Q. How about Commander Neil, do you know
14 Commander Neil in the police department?
15    A. Yes, sir.
16    Q. Has he done political work for you?
17    A. Yes, sir.
18    Q. Okay. How about former Commander Patterson in
19 the police department, has he done political work for
20 you?
21    A. Yes.
22    Q. Okay. How about Sammy Young, do you know
23 Sammy Young?
24    A. Yes.

Page 63

1    Q. Has he done political work for you?
2    A. Yes.
3    Q. Okay. And what's his position in the police
4 department?
5    A. Sammy is the director of --
6    Q. Part-timers?
7    A. -- community resource officer.
8    Q. Okay. How about Deputy Chief Banks, has he
9 done political work for you?
10    A. I can't recall -- I can't recall. I'm not
11 sure.
12    Q. Showing you what I'm going to mark as Kellogg
13 Exhibit 6.
14        (Kellogg Deposition Exhibit No. 6
15        marked as requested.)
16 BY MR. WALSH:
17    Q. Do you recognize Exhibit 6?
18    A. Yes.
19    Q. And would you turn to the last page. Is that
20 your signature?
21    A. Yes.
22    Q. And did you review this document before you
23 signed it?
24    A. Yes.

Page 64

1    Q. Okay. I'm going to call your attention to
2 Page 2.
3    A. Uh-huh.
4    Q. No. 17 asks you to identify all employees
5 of -- or contractors with the City of Harvey that have
6 done political work for Eric Kellogg, your answer is not
7 known.
8        Why was your answer not known if today you're
9 able to identify multiple employees that have done
10 political work for you?
11    A. It's very simple, you said all, and I would
12 state the same thing, I don't know all so it would be
13 not known.
14    Q. Okay. Can you identify any employees that
15 have done political work for you other than -- or can
16 you identify other Harvey employees who have done
17 political work for you other than what you have already
18 testified to today?
19    A. Not known.
20    Q. You can't identify a single person?
21    A. I can't recall.
22    Q. Do you know Nick Graves?
23    A. Yes, sir.
24    Q. And who was Nick Graves?

Page 65

1    A. Nick Graves was the former police chief, the
2 former baseball coach in the community, former business
3 owner, I believe, and former mayor of Harvey, who I --
4 you know, who I happened to attend his funeral and said
5 some pretty good things about Mayor Graves and may he
6 rest in peace.
7    Q. So you said some pretty nice things about him
8 at his funeral?
9    A. Yes.
10    Q. Okay. You were a speaker at his funeral?
11    A. Yes, yes.
12    Q. So he was your opponent in '99, correct?
13    A. Yes.
14    Q. Did you ever debate Nick Graves?
15    A. I can't recall.
16    Q. Did you ever speak with him before the '99
17 election?
18    A. I can't recall.
19    Q. You were an alderman at the time, correct?
20    A. Absolutely.
21    Q. And was he a police chief or was he police
22 chief at that time?
23    A. I believe he -- I think he was -- he was
24 either working with Dixmoor or Harvey, I'm not -- I

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 3 of 16 PageID #:469

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 66..69

Page 66

1 can't recall.
2  Q. Okay. Did you ever meet Nick Graves' campaign
3 manager, Rosemaria Genova? Genova I should say.
4  A. I thought Chris Barton was his campaign
5 manager.
6  Q. In '99 or 2003?
7  A. I thought he ran basically all his -- I mean,
8 to the best of my recollection, I thought Chris Barton
9 was --
10  Q. Okay. Did you ever meet Rosemaria Genova?
11  A. Best -- my best recollection, I can't recall.
12  Q. Okay. Were you the only speaker -- or strike
13 that.
14   Did you see a woman speak at Nick Graves'
15 funeral, give the eulogy?
16  A. I -- I can't recall. I know -- I know I
17 spoke.
18  Q. Okay. Did anyone else speak?
19  A. I can't recall exactly who all spoke because I
20 was pretty -- it was pretty heartbreaking.
21  Q. Do you know whether Rosemaria Genova worked on
22 Nick Graves' campaign in '99 or 2003?
23  A. I can't -- I can't recall if she did or she
24 did not. I'm not sure. I can't recall.

Page 67

1  Q. When you were an alderman, did Harvey have a
2 newsletter?
3  A. When I was an alderman?
4  Q. Yes.
5  A. I can't recall if we had a newsletter back
6 then. I'm not sure.
7  Q. Do you know if Rosemaria Genova wrote the
8 newsletter in Harvey?
9  A. I can't recall if she did or didn't.
10  Q. Did you ever meet -- meet anyone named
11 Rosemaria Genova at a Harvey council meeting?
12  A. I can't recall. I -- I can't recall meeting
13 her at a Harvey city council meeting. I -- I can't
14 recall.
15  Q. Do you know Rosemaria's husband, Jerry Genova?
16  A. I knew him as the Mayor of Calumet City.
17  Q. Okay. And did you meet during the time that
18 he was mayor?
19  A. I can't exactly recall exactly when and where
20 we met, but I knew that he was the Mayor of Calumet
21 City.
22  Q. And that was during the same time that you
23 were alderman in Harvey, correct?
24  A. I don't know the years. I can't associate the

Page 68

1 dates, the years, the times, the places where I met
2 Mayor Genova.
3  Q. Does Calumet City border Harvey?
4  A. It's not particularly next door, no.
5  Q. Okay. Do you know how far it is from Harvey?
6  A. It's -- you probably have to go through four
7 different communities to get there.
8  Q. It's that far?
9  A. Yeah.
10  Q. Okay. Did you ever go to a -- Strike that.
11   Did you ever see Mr. Genova at any social
12 functions while he was mayor?
13  A. I can't recall if I ever saw Mayor Genova at
14 any social events.
15  Q. When you appointed Joseph Letke as
16 comptroller, were there other applicants for the
17 position?
18  A. I'm -- I'm -- I can't recall at the time if
19 there was, but prior to Mr. Letke, I think Stanley King
20 was our accountant so I'm not -- I can't recall if there
21 was other applicants.
22  Q. Did Mr. Letke's political contributions play a
23 role in your decision for you to appoint him?
24  A. I select individuals based on their

Page 69

1 qualifications.
2  Q. So is that a no?
3  A. Again, I selected Mr. Letke based on his
4 qualifications.
5  Q. And I have to get a clear record so, you know,
6 I need you --
7  A. I mean, just because someone donates to my
8 campaign don't -- you know, no, it was based on his
9 qualifications.
10  Q. Okay. Not on the donation?
11  A. No, sir.
12  Q. Okay. At the time he was appointed, his
13 company was called Letke & Associates, correct?
14  A. I believe so.
15  Q. And do you know whether it later became Alli
16 Financial?
17  A. I believe at some time it became Alli
18 Financial.
19  Q. Okay. Did Mr. Letke ever give you anything of
20 value in exchange for being appointed comptroller?
21   MR. SMITH: Object to the form of the question.
22   When you say thing of value --
23   MR. WALSH: Uh-huh.
24   MR. SMITH: -- are you referring to a political

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 4 of 16 PageID #:470

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 70..73

Page 70

1  contribution or something else?
2      MR. WALSH: I'm talking about financial -- anything
3  that's financial, not just -- not limited to a political
4  contribution and I'm not talking labor.
5      MR. SMITH: So -- so the question is --
6      MR. WALSH: Did he give you any money?
7      MR. SMITH: -- any kickbacks?
8      MR. WALSH: No, no, no, I didn't say kickbacks.
9  BY MR. WALSH:
10     Q. Did he give you any money, be it any kind of
11  money, be it political contribution or otherwise in
12  exchange for being appointed comptroller?
13     A. The best of my recollection Mr. Letke is just
14  like anyone who donates to my campaign. They donate to
15  my campaign, they don't donate to me.
16     Q. Okay. Has Mr. Letke ever given you money
17  outside of a campaign donation?
18     A. Why would he give me money outside a campaign
19  donation?
20     Q. I can't speak for Mr. Letke, I'm just asking
21  you if you ever --
22     A. No, I don't accept money outside of campaign
23  donations --
24     Q. Okay.

Page 71

1      A. -- from anyone.
2      Q. Okay. What were Mr. Letke's responsibilities
3  between 2008 and 2010?
4      A. It's clear he was the comptroller who served
5  as the financial advisor and provided guidance on
6  financial matters and erected -- well, he provided
7  direction and guidance to the mayor as well as the city
8  council and financial matters.
9      Q. Did other department heads need to get
10  approval from Mr. Letke for expenditures?
11     A. In terms of the -- the overall -- the overall
12  operations and the nuances of that particular office --
13     Q. Yes.
14     A. -- that's between the department head and
15  Mr. Letke.
16     Q. You don't know?
17     A. I'm sure that they -- there was some -- you
18  know, they had to work, you know, collectively together.
19     Q. Harvey is supposed to put a budget together
20  each year, correct?
21     A. Yes.
22     Q. Okay. And do the department heads each create
23  a budget for their own department?
24     A. To the best of my knowledge, they do.

Page 72

1      Q. Okay. And then is there an individual that
2  assembles those individual budgets into the city budget?
3      A. It's my understanding that each department
4  head assembles a budget and they submit the budget to
5  our comptroller.
6      Q. Okay. So was Mr. Letke in charge of, I guess,
7  sort of synthesizing budgets while he was the
8  comptroller?
9      MR. SMITH: I'm going to object to any further
10  questions regarding Mr. Letke's role as comptroller and
11  I'm going to instruct the witness based on the Fifth --
12  the provision of the Fifth Amendment not to
13  self-incriminate due to the pending SCC litigation and
14  also because these questions can be asked when Mr. Letke
15  is deposed.
16         Mayor Kellogg is not a CPA, he's not a lawyer,
17  and the office of the comptroller, those duties are
18  designated by the Illinois Municipal Code.
19     MR. WALSH: Okay.
20     MR. SMITH: We're not going -- we're not going to
21  answer no questions about --
22     MR. WALSH: He can plead the Fifth all he wants,
23  you don't have to do a big speaking objection.
24         My -- my point is that as the mayor he

Page 73

1  probably has some knowledge of what department head's
2  functions are and not really get into very much detail.
3         If he want's to plead the Fifth to Letke,
4  that's fine. I have to ask the questions to get a clear
5  record. I don't have a problem with it.
6      MR. SMITH: That's fine.
7  BY MR. WALSH:
8      Q. Did Mr. Letke have an office in Harvey while
9  he was comptroller?
10     MR. SMITH: You can answer that question.
11  BY THE WITNESS:
12     A. Yes.
13     Q. Okay. And was the office in close proximity
14  to yours?
15     A. No.
16     Q. Was it in City Hall? I mean Letke's office.
17     A. Yes.
18     Q. Did other employees of Letke & Associates
19  perform work for Harvey while he was the comptroller?
20     A. He had a team.
21     Q. And do you know who was on his team?
22     A. I believe it was Maggie Britton, I believe.
23     Q. Uh-huh.
24     A. And Gloria -- I can't recall Gloria's last

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 5 of 16 PageID #:471

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 74..77

Page 74

  1  name.
  2    Q.  Okay.  And did Maggie and Gloria work in
  3  Harvey City Hall?
  4    A.  Yes, they did.
  5    Q.  When Joseph Letke was the comptroller, how
  6  often did you interact with him?
  7    A.  Understand that I was part-time and my
  8  full-time duties were really at the school so my
  9  interactions with, you know, the employees of the city
 10  was extremely limited due to the fact that I was working
 11  at the school.
 12    Q.  Okay.  How often did you speak with Mr. Letke
 13  each week while he was comptroller?
 14    A.  Very limited.
 15    Q.  Would you speak to him at least once a week?
 16    A.  I wouldn't -- I can't recall speaking to him
 17  once a week.  It was very limited.
 18    Q.  Did Maggie Britton and Gloria work at Harvey
 19  full-time?
 20    A.  I'm not sure if they were there full-time or
 21  part-time.
 22    Q.  Have you ever met Maggie Britton?
 23    A.  Yes.
 24    Q.  Was her office -- did she have a separate

Page 75

  1  office in the City of Harvey?
  2    A.  They worked out of the comptroller's office.
  3    Q.  Did Ms. Britton brief you on Letke &
  4  Associates' activities in the City of Harvey?
  5    A.  Brief me?
  6    Q.  Uh-huh, did Ms. Britton ever discuss with you
  7  what Letke & Associates was doing in Harvey?
  8    A.  Again --
  9    MR. SMITH:  Object to the form of the question.
 10          What Letke & Associates was doing?
 11    MR. WALSH:  Uh-huh.
 12    MR. SMITH:  What exactly do you mean?
 13  BY MR. WALSH:
 14    Q.  What sort of job functions they were
 15  performing.
 16    A.  Well, as I indicated earlier, me working
 17  full-time at the school, my conversation with
 18  Ms. Britton and Mr. Letke were very limited.  Most of
 19  the conversation was handled -- if there was
 20  conversation, it would be from my administrative
 21  assistant, but my conversation with them was very
 22  limited.
 23    Q.  Do you know how many employees of Letke &
 24  Associates performed work for Harvey?

Page 76

  1    A.  I wouldn't know that.  I wouldn't know in
  2  terms of how many employees Mr. Letke had working out of
  3  the Harvey office.
  4    Q.  Doing work on Harvey matters.
  5    A.  I wouldn't know that.  I couldn't.
  6    Q.  Did Mr. Letke -- did Mr. Letke used to tell
  7  you when he would hire someone at Letke & Associates?
  8    A.  Well, Letke & Associates is a separate entity
  9  from the City of Harvey.
 10    Q.  Understood.
 11    A.  So, I mean, that's his business.
 12    Q.  Understood.
 13        What I'm asking you is did he -- did he have a
 14  policy or practice of telling you when he hired someone
 15  new at Letke & Associates?
 16    A.  I mean, that's his business, why would he have
 17  to confirm -- you know, he wouldn't have to confirm with
 18  me, that -- that's his business --
 19    Q.  And I understand --
 20    A.  -- which is a separate entity from the City of
 21  Harvey.
 22    Q.  I understand that.
 23        What I'm asking you though is did he have a
 24  habit of telling you when he hired someone at Letke &

Page 77

  1  Associates?
  2    A.  Well, a habit is a pattern.
  3    Q.  Right.
  4    A.  And so there was no repetitive practice of
  5  Mr. Letke informing me of individuals that he hired
  6  because that's his firm, I can't, you know --
  7    Q.  Do you ever recall him telling you that he had
  8  hired someone at Letke & Associates?
  9    A.  That's my recollection, I can't recall having,
 10  you know, conversations about his employees.
 11    Q.  Do you ever recall him telling you that he had
 12  hired Mr. Genova?
 13    A.  Best of my recollection, I can't recall having
 14  a conversation relative to Mayor Genova.
 15    Q.  Showing you what I will mark as Exhibit 7.
 16        (Kellogg Deposition Exhibit No. 7
 17        marked as requested.)
 18  BY MR. WALSH:
 19    Q.  Showing you what's been marked as Exhibit 7.
 20  Exhibit 7 are -- is Joseph Letke's answers to
 21  interrogatories in this case.
 22    A.  Uh-huh.
 23    Q.  And I want to call your attention to Page 6,
 24  No. 15, and it asks to identify whether Joseph Letke

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 6 of 16 PageID #:472

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 78..81

Page 78

1  ever discussed plaintiff with Eric Kellogg and your
2  answer was in the affirmative, identify the time, date,
3  location and subject matter of the conversation.
4      A.  Uh-huh.
5      Q.  His answer is as -- as it's answered in
6  Interrogatory No. 15, defendant states that several
7  weeks after hiring plaintiff, he discussed with Kellogg
8  that plaintiff had been hired to work at Letke &
9  Associates in marketing; do you recall that?
10     A.  Best of my recollection, I don't recall having
11 a conversation with Mr. Letke.
12     Q.  Did Maggie Britton ever discuss -- or did you
13 ever talk about Jerry Genova with Maggie Britton?
14     A.  The best of my recollection I don't ever
15 recall having a conversation with Maggie about
16 Mayor Genova.
17     Q.  You don't recall one way or the other or you
18 don't --
19     A.  No.  I guess my point is Mayor Genova didn't
20 work for the City of Harvey.
21     Q.  Right.
22     A.  So the best of my recollection, I don't recall
23 ever having a conversation with Maggie.
24     Q.  Maggie didn't work for the City of Harvey, did

Page 79

1  she?
2      A.  Maggie was a contractual employee of the City
3  of Harvey.
4      Q.  Oh, she was.
5      A.  That worked out of the City of Harvey's
6  office.
7      Q.  Was Joe Letke an employee of the City of
8  Harvey?
9      A.  He could be considered a contractual employee
10 of the City of Harvey.
11     Q.  As a department head, correct?
12     A.  Well, again, it's consistent with the other
13 verbiages in the other document that you shared with me
14 earlier.
15     Q.  He was the head of the finance department,
16 correct?
17     A.  He handled all financial matters basically.
18     Q.  Is there such a thing as a finance department
19 at the City of Harvey?
20     A.  There's the comptroller's office.
21     Q.  My question is is there a finance department
22 at the City of Harvey?
23     A.  The finance for -- you know, a play of words,
24 finance, comptroller office, I -- I refer to it as a

Page 80

1  comptroller's office.
2      Q.  Okay.  You ever meet a gentleman named
3  Christopher Galloway?
4      A.  Christopher Galloway?
5      Q.  An attorney that worked for Letke &
6  Associates.
7      A.  I don't recall.  I don't recall.  I don't
8  recall meeting -- I don't recall.
9      Q.  You don't recall one way or the other?
10     A.  Christopher Galloway?
11         Best of my recollection, I can't recall if I
12 have met --
13     Q.  Was the comptroller a salaried position?
14     A.  It was contractual.
15     Q.  Contractual could be hourly and it could be
16 salary, couldn't it?
17     A.  It was contractual.  He had a contract with
18 the City of Harvey.
19     Q.  And was he paid by salary or by the hour?
20     A.  By the -- the stipulation associated with his
21 contract.
22     Q.  Okay.  And what was that?
23     A.  It was basically handling the financial
24 matters of the City of Harvey.

Page 81

1      Q.  Do you know if he was paid a salary or paid
2  hourly?
3          MR. SMITH:  I'm going to object to the form of the
4  question.  If you -- if you understand the question.
5          I mean, are you suggesting that Mr. Letke had
6  a W-2 from the City of Harvey, is that --
7          MR. WALSH:  No, I'm asking how he was paid, by
8  salary or by an hourly rate.
9          MR. SMITH:  He said he was paid pursuant to
10 contract.
11         THE WITNESS:  Right.
12         MR. WALSH:  Exactly.  So what was that?  You tell
13 me.  If you understand that, you tell me, was it salary
14 or hourly?
15         MR. SMITH:  I'm not the witness.
16         MR. WALSH:  Okay.
17         MR. SMITH:  I'm trying to understand what the
18 question is.
19         MR. WALSH:  I don't see how that's difficult.
20 BY MR. WALSH:
21     Q.  Salary or hourly?
22     A.  Well, contractual.
23     Q.  Contractual salary or contractual hourly?
24     A.  Contractual.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 7 of 16 PageID #:473

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 82..85

Page 82

1  Q. You don't know?
2  A. Again, he was under a contract. He operated
3  off a contract so I can't speak to that actually in
4  exact numbers.
5  MR. SMITH: Mr. Walsh, I don't mean to put a
6  question in your mouth, but was the contract based on an
7  annual salary or was the contract based on --
8  MR. WALSH: I already asked that.
9  THE WITNESS: He was contract.
10 MR. SMITH: If you -- if you know.
11 BY MR. WALSH:
12 Q. There are police officers that are paid
13 hourly, correct?
14 A. Yes.
15 Q. Okay. And they are under a contract, correct?
16 A. Correct.
17 Q. Okay. And then there are employees who are
18 under a contract and paid a salary, correct?
19 A. Correct.
20 Q. Okay. So the fact that someone is under
21 contract is not determinative of -- wait, let me
22 finish -- of whether someone is paid by salary or by the
23 hour.
24    So putting aside for the moment that there's a

Page 83

1  contract, do you know whether Mr. Letke was paid by
2  salary or on hourly basis?
3  A. Can I just --
4  Q. Yeah.
5  A. -- debate your point?
6  MR. SMITH: You can't debate the point.
7     I mean, I think the proper question is do you
8  know how Mr. Letke was paid?
9  THE WITNESS: I want to respond to him, but I want
10 to --
11 MR. WALSH: I think that's what I have been asking.
12 THE WITNESS: Because the theory is --
13 MR. WALSH: You can't --
14 THE WITNESS: Oh, I'm sorry.
15 BY MR. WALSH:
16 Q. I just want to know, do you know if he was
17 paid by hourly or by salary?
18 A. And I still say contractual.
19 Q. So you don't know one way or the other?
20 A. Contractual.
21 Q. And like when you say contractual, what do you
22 mean?
23 A. He had a contract with the City of Harvey.
24 Q. Okay.

Page 84

1  A. And he had to -- there was certain
2  stipulations in his contract that associated with the
3  financial matters of the City of Harvey.
4  Q. Do you have a copy of his contract?
5  A. Not in front of me.
6  Q. At the city?
7  A. I can -- I'm sure there has to be some form of
8  contract.
9  Q. Okay. How -- did Maggie Britton -- do you
10 know if she was paid by salary or by hourly rate?
11 A. Again, you're asking me a question relative to
12 Maggie Britton who worked for Mr. Letke.
13 Q. Uh-huh.
14 A. I don't know the interoperations of his
15 organization. I don't know how he paid Ms. Britton.
16 Q. Earlier you said that Maggie Britton was an
17 employee of the City of Harvey.
18 A. Contractual.
19 Q. Employed at the City of Harvey, right?
20 A. Well, let me --
21 Q. So I'm asking you how --
22 A. Just so we won't be confused, just so won't be
23 confused, Mr. Letke was awarded a contract, Mr. Letke
24 brought in individuals who worked for his office, but

Page 85

1  did work for the city.
2  Q. Uh-huh.
3  A. So Maggie Britton worked for Joseph Letke
4  technically, okay?
5  Q. So she was paid by Letke or paid by Harvey or
6  by both?
7  A. She was paid by Mr. Letke.
8  Q. Okay. But not paid by Harvey?
9  A. My understanding is she was paid by Mr. Letke.
10 Q. And how many -- Strike that.
11    Do you know if Mr. Letke would submit an
12 hourly invoice for employees that worked on Harvey
13 matters?
14 A. Again, Mr. Letke had a contract that he was
15 paid based on the duties and responsibilities associated
16 with his contract.
17 Q. So do you know whether he submitted an
18 invoice?
19 A. Any -- anyone who does work for the City of
20 Harvey would have to submit some kind of, you know, form
21 of -- shall we say a receipt that let's the city know
22 that the work was being done.
23 Q. And does the city have a form that went by a
24 particular name to do that?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 8 of 16 PageID #:474

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 86..89

Page 86

1   A.   In terms of --
2   Q.   You know, other than calling it an invoice,
3 did the City of Harvey have a particular name for such a
4 form?
5   A.   I believe it was an invoice.
6   Q.   Okay. Did you ever see an invoice submitted
7 by Joseph Letke?
8   A.   Again, the invoices would be submitted to the
9 city council and the city council would vote on the
10 invoices.
11  Q.   Did you ever see an invoice submitted by
12 Joseph Letke?
13  A.   As I indicated, the processes --
14  Q.   Uh-huh.
15  A.   The City of Harvey has a finance committee
16 that reviews the bills, the bills at that time, submit
17 it to the city council or the city council votes on the
18 bills.
19  Q.   That's -- thank you for the process, but I'm
20 asking you, have you ever seen an invoice submitted by
21 Letke & Associates?
22  A.   I can't recall if I ever --
23  Q.   You don't recall one way or the other?
24  A.   I can't recall.

Page 87

1   Q.   Okay. Do you know whether Mr. Genova worked
2 on matters for the City of Harvey through Letke &
3 Associates?
4   A.   Mr. Letke's interoperations relative to Letke
5 & Associates -- I don't sit on the board of directors
6 for Mr. Letke so I don't know who Mr. Letke hires.
7   Q.   So hiring, that might be one thing, but my
8 question to you is do you know whether Mr. Genova worked
9 on any Harvey matters while he was with Letke &
10 Associates?
11  A.   Best of my recollection, Mr. Mayor Genova, you
12 know, didn't work on any matters associated with City of
13 Harvey, best of my recollection.
14      MS. COURT REPORTER: Did you say didn't or did?
15      THE WITNESS: No, he didn't.
16      MS. COURT REPORTER: Okay. Just double-checking.
17      THE WITNESS: Right. Just to the best of my
18 recollection.
19 BY MR. WALSH:
20  Q.   And what was the basis for that opinion?
21  A.   I've never seen Mr. - -- I mean, Mayor Genova,
22 you know, at the City of Harvey in the comptroller's
23 office.
24  Q.   I believe you explained the process for when

Page 88

1 Mr. Letke would submit an invoice, let me ask you this,
2 when Mr. Letke submitted an invoice, did that invoice go
3 straight to the council for approval or did someone else
4 have authority to approve his invoices?
5   A.   Yeah, all invoices go through the city council
6 for approval and they are voted on.
7   Q.   Okay. And are they voted on in the same
8 format as they're submitted?
9   A.   I'm not -- I'm not sure what the question is
10 you're asking me.
11      I can only speak to the process in terms of
12 what I know the process to be. I can't speculate. I
13 can only tell you this is what the process is, the
14 process, the bills are submitted, the aldermen --
15  Q.   Uh-huh.
16  A.   -- they peruse the bills and then they
17 deliberate, legislate and vote on the bills.
18  Q.   Do you peruse the bills too?
19  A.   Generally I don't. Generally aldermen
20 bills -- I really -- as I indicated earlier, my reliance
21 on -- on those particular matters at the time was left
22 to the automatic aldermen as well as Ms. Lewis.
23  Q.   So my question to you is do you ever peruse
24 his bills?

Page 89

1   A.   Again, I don't -- no, your question was do I
2 approve the bills.
3   Q.   Right.
4   A.   Right.
5       And, again, as I indicated, my sister,
6 Ms. Lewis --
7   Q.   Uh-huh.
8   A.   -- was in charge of the day-to-day operations.
9 She worked very closely with the department heads and I,
10 you know, periodically would -- would over -- you know,
11 a ten, 11 year period I would, you know, look at a bill,
12 but no bills in particular.
13  Q.   So is your sister at Harvey the most knowledge
14 of Mr. Letke's invoices?
15  A.   I believe the aldermen as well as the ones who
16 voted on the particular bills.
17  Q.   Okay. How about your sister?
18  A.   I believe -- she didn't vote on the bills.
19  Q.   Okay. But she was in charge of putting them
20 together for the aldermen?
21  A.   No.
22  Q.   Who was in charge of doing that?
23  A.   The bills -- I believe the aldermen have to
24 analyze, scrutinize the bills and then they submit the

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 9 of 16 PageID #:475

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 90..93

Page 90

1  bills for passage.
2  Q. Who submits the bills to the aldermen?
3  A. I believe the -- if I'm not mistaken, it might
4  be the comptroller's office submits the bills, all the
5  bills.
6  Q. Do you know whether the names of the employees
7  of Letke & Associates that worked on Harvey matters
8  would appear on the bills?
9  A. I believe that Letke & Associates would appear
10 on the bills, yes.
11 Q. Could you repeat that? I'm sorry.
12 A. I believe, if, in fact -- whatever name of the
13 company would appear on the bills.
14 Q. I'm asking you about the employees.
15 A. The one --
16 Q. Did the names of the employees at Letke &
17 Associates that did work on Harvey accounts appear on
18 the bills submitted to Harvey?
19 A. No, it was my understanding that, you know, it
20 would be Letke & Associates and -- such as that. I
21 wouldn't think that each particular individual that
22 worked for Mr. Letke and Harvey would be associated with
23 the business.
24 Q. Do you know whether their names appear on the

Page 91

1  bills or are you guessing?
2  A. No, I'm stating a fact, that Mr. Letke's bill
3  would be submitted as Letke & Associates.
4  Q. Uh-huh.
5  A. And there wouldn't be a need for any
6  individual itemized list associated with his company.
7  It's Letke & Associates, not Letke and ten other people.
8  Q. So the individual employee names did not
9  appear on the bills that he submitted?
10 A. My understanding is it was -- again, the best
11 of my recollection is it was submitted as Letke &
12 Associates.
13 Q. And over the ten, 11 year period, I believe
14 you said you may have looked at some bills, how many
15 Letke & Associates bills did you look at?
16 A. Again, as I indicated earlier, I don't
17 specifically, you know, scrutinize or laser focus on one
18 bill, I peruse the bills.
19 Q. So do you have a recollection of how many
20 Letke & Associate bills you've perused over the period
21 that he was comptroller?
22 A. As I indicated earlier, I don't -- I don't
23 just specifically look at Mr. Letke's bills, I look at
24 all bills.

Page 92

1  Q. Uh-huh.
2  A. So I couldn't recall, you know, how many times
3  I looked at Commonwealth Edison versus Mr. Letke versus
4  John Doe.
5  Q. Do you ever remember seeing a Letke bill?
6  A. As I indicated, I generally don't vote on the
7  bills.
8  Q. Here's what I'm asking you: Do you ever
9  remember seeing a single bill submitted by Letke &
10 Associates?
11 A. I can't recall seeing a particular single bill
12 associated with Mr. Letke, but, again, because the bills
13 list is a very cumbersome document and so bills are
14 submitted in the finance chair, they vet through the
15 process, they vet through the various bills, and then at
16 point, they vote on it.
17 Q. But you don't ever remember seeing a Letke
18 bill?
19 A. I don't. The best of my recollection, I can't
20 recall.
21 Q. Okay. What method of communication did you
22 generally utilize with Mr. Letke?
23 A. It would be if, in fact -- it would be at a
24 meeting.

Page 93

1  Q. So verbal?
2  A. If I had oral --
3  Q. Okay.
4  A. -- or sometimes via telephone.
5  Q. How about e-mails?
6  A. I'm not really big on e-mails.
7  Q. Uh-huh.
8  A. However, Mr. Letke might have sent several
9  e-mails to the City of Harvey.
10 Q. Okay. Do you ever use e-mail for your
11 official duties as mayor?
12 A. Sometimes.
13 Q. How many e-mails do you think you sent as
14 mayor?
15 A. I couldn't even speculate on the number.
16 Q. What is the process for you to receive a memo
17 as mayor? In other words, if someone mails a memo to
18 your attention at the City of Harvey, do you get
19 envelopes on your desk or are they opened for you, are
20 they reviewed? Do you understand that?
21 A. Yeah, generally they are opened and then put
22 in a large binder and then I'll look through the various
23 memos.
24 Q. Okay. And that includes memos that are

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 10 of 16 PageID #:476

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 94..97

Page 94

1  written to you or that you are carbon copied on?
2      A.  Yes.
3      Q.  Okay.  Do you have a procedure where memos are
4  stamped received?
5      A.  No, generally what happens is that the various
6  memos from the various departments are put in large
7  envelopes and then, you know, come to the office, sit
8  down and look at the various documentation.
9      Q.  And is that something that Drenia Lewis does
10 for you?
11     A.  It could be Drenia Lewis, it could be one of
12 the secretaries.
13     Q.  And who are the secretaries?
14     A.  Michelle Robinson (phonetic).
15     Q.  Anyone else?
16     A.  There's Michelle Robinson, yeah.
17     Q.  Is there another secretary?
18     A.  At City Hall, no, she was basically -- her and
19 Ms. Lewis are kind of responsible for that.
20     Q.  Okay.  Are you related to Michelle Robinson?
21     A.  No, sir.
22     Q.  Okay.  Has Michelle Robinson ever done
23 political work for you?
24     A.  I can't really say for sure.

Page 95

1      Q.  Was she on the golf outing committee?
2      A.  I don't think so.
3      Q.  Do you know if she ever attended any political
4  functions of yours?
5      A.  I can't recall ever seeing her.
6      Q.  Do you recall seeing her at your campaign
7  office?
8      A.  I don't recall seeing her there.  I can't
9  recall.
10     Q.  Did you have an opportunity to observe
11 Joe Letke performing the duties of comptroller?
12     MR. SMITH:  I'll object to the form of the
13 question.
14         Observe?
15     MR. WALSH:  Uh-huh.
16     MR. SMITH:  What do you mean observe?
17     MR. WALSH:  See.
18 BY MR. WALSH:
19     Q.  Did you see him perform the duties of
20 comptroller?
21     A.  In terms of sitting down and watching him
22 actually -- as I indicated earlier, due to the fact that
23 I was working at the school, my -- my observation was
24 somewhat limited and my observation and interaction with

Page 96

1  Mr. Letke, as well as a lot of the department heads, was
2  quite limited.  I can't recall ever actually, you know,
3  seeing him.  I can't recall.
4      Q.  Did you ever get to observe his work product?
5      A.  I seen some of his documents.
6      Q.  Did you observe enough of his work product to
7  be able to form an opinion of the job he did as
8  comptroller?
9      MR. SMITH:  I'm going object to the form of the
10 question based on the fact that the witness isn't
11 qualified to give an opinion as to the quality of the
12 comptroller's work.
13         If you -- if you're qualified to give an
14 opinion as to the qualify -- the quality of Letke's
15 work, you can testify.
16 BY THE WITNESS:
17     A.  Yeah, I don't have the expertise to actually
18 grade his --
19     MR. WALSH:  I'm going to say those objections are
20 leading and I'm going to ask that you not do that any
21 longer, okay?
22         Objections in Federal Court should just be to
23 form basically.  These long speaking objections of if
24 you know, you can answer, if you understand the

Page 97

1  question, you can answer, that's all leading, okay?
2      MR. SMITH:  We can go off the record for a second.
3      MR. WALSH:  No, we're staying on the record.
4      MR. SMITH:  Okay.  We're on the record.
5      MR. WALSH:  Yeah.
6      MR. SMITH:  You're asking a witness with a
7  background in education whether he can evaluate the
8  quality of a CPA's work, that's not a fair question.
9      MR. WALSH:  Okay.
10     MR. SMITH:  Okay.
11 BY MR. WALSH:
12     Q.  Let me ask you this, who is in charge of --
13 why isn't Mr. Letke working at Harvey anymore?
14     MR. SMITH:  I'm going to object to the question.
15     MR. WALSH:  Why?
16     MR. SMITH:  Based on my prior objection because of
17 the SCC litigation.
18     MR. WALSH:  It's not an objection, he can assert
19 the Fifth Amendment if wants, but you can't object to a
20 relevant question.
21     MR. SMITH:  We are going to assert the Fifth
22 Amendment.
23     MR. WALSH:  Okay.
24     MR. SMITH:  We are not going to discuss --

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 11 of 16 PageID #:477

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 98..101

Page 98

1  MR. WALSH: Okay. Just -- just assert the Fifth
2  Amendment, don't object to the questions.
3  MR. SMITH: Okay. We're going to assert the Fifth
4  Amendment and object to the question.
5  MR. WALSH: Okay. So you didn't -- he's got to
6  assert it, right, not you.
7  BY MR. WALSH:
8  Q. So I'm going to ask you.
9  Why doesn't Joseph Letke work at Harvey any
10 longer?
11 A. I'll assert the Fifth Amendment.
12 Q. Was Mr. Letke terminated from Harvey?
13 A. I assert the Fifth Amendment.
14 Q. Did you make the decision to terminate
15 Mr. Letke from Harvey?
16 A. I assert the Fifth Amendment.
17 Q. Do you know whether Mr. Letke claims that he
18 resigned from Harvey?
19 A. I'll assert the Fifth Amendment.
20 Q. Showing you what I will mark as Kellogg 7 --
21 8, pardon me.
22          (Kellogg Deposition Exhibit No. 8
23           marked as requested.)
24

Page 99

1  BY MR. WALSH:
2  Q. Do you recognize Exhibit 8?
3  A. I assert the Fifth.
4  Q. Do you know whether the contents of Exhibit 8
5  are correct?
6  A. I assert the Fifth.
7  Q. Have you seen Exhibit 8 before today?
8  A. I assert the Fifth.
9  Q. Generally speaking, who at Harvey has the
10 authority to terminate a comptroller?
11 A. I assert the Fifth.
12 Q. Do you know of anyone -- Strike that.
13 Do you know of any aldermen or supervisory
14 employee at the City of Harvey that has a CPA?
15 A. Any aldermen?
16 Q. Uh-huh.
17 A. I don't -- the best of my recollection, I
18 don't think any alderman has a CPA.
19 Q. Okay. So is there any alderman that would be
20 qualified to give an opinion that Joseph Letke would be
21 terminated based on his work product?
22 A. I mean, that's -- I'm going to just take the
23 Fifth on that.
24 Q. I believe you testified you were voted -- or,

Page 100

1  excuse me, appointed superintendent of District -- what
2  was the District?
3  A. 152.
4  Q. Thank you.
5  152 in 2011, correct?
6  A. I believe it was 2010. I'm not sure of the
7  exact date.
8  Q. Okay. And it was supposed to be a three year
9  term?
10 A. It was a three year contract.
11 Q. A three year contract.
12 And did you leave before the expiration of the
13 contract?
14 A. I retired.
15 Q. And who made the decision to appoint you
16 superintendent?
17 A. There's an interview process.
18 Q. Okay.
19 A. Based on the qualifications and association
20 and the interview, I was selected.
21 Q. How do you know what the basis was of you
22 being appointed?
23 A. Qualifications.
24 Q. Well, you didn't -- and I don't mean this

Page 101

1  facetiously, you didn't appoint yourself, correct,
2  someone else appointed you?
3  A. Absolutely.
4  Q. So how do you know what --
5  A. Yeah, the interview process.
6  Q. Okay. So there's an interview process.
7  And who interviewed you?
8  A. Board of Education, I believe, yeah.
9  Q. Okay. The full board?
10 A. I believe -- you know, generally, when there's
11 an interview process, there's -- you know, various
12 staples of the community, Board of Education.
13 Q. And who were the members of the board at the
14 time you were appointed superintendent?
15 A. I believe it was -- I -- let me see.
16 Ms. Rogers -- no, no, no, no. I don't believe
17 she -- I can't really recall all the board members at
18 that time.
19 Q. Do you recall any?
20 A. Let me see.
21 Yeah, Ms. Kellogg Weaver was one.
22 Q. That's your sister, correct?
23 A. Yes.
24 Q. Okay. Do you recall any others?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 12 of 16 PageID #:478

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 102..105

Page 102

1   A.   I can't recall that.
2   Q.   And one of them was your cousin, wasn't it?
3   A.   If that's what you say.
4   Q.   I'm asking you, was one of the board members
5   your cousin?
6   A.   You just -- you just stated that that was my
7   cousin.
8   Q.   I'm asking you, was one of the board members
9   your cousin?
10  A.   What was her name?
11  Q.   I'm asking you if one of the board members was
12  your cousin.
13  A.   No, but you stated earlier that --
14  Q.   Right, and now I'm asking you.
15       I'll withdraw the statement and now I'm asking
16  you a question.  Was one of the board members your
17  cousin?
18  A.   Yes.
19  Q.   Okay.  And who is that?
20  A.   Linda Hawkins.
21  Q.   And was one of the board members
22  Tyrone Rogers?
23  A.   I believe he was at the time.
24  Q.   And that is Janet Rogers' husband?

Page 103

1   A.   Yes.
2   Q.   And were there other Harvey employees on the
3   board that voted to appoint you superintendent?
4   A.   I don't recall at the time what the vote was.
5   Q.   Has your sister, Joyce Kellogg Weaver, ever
6   done political work for you?
7   A.   Yes.
8   Q.   And what sort of political work has she done
9   for you?
10  A.   Communicating with, you know, various
11  residents, talking to residents.
12  Q.   And is that over the phone or in person?
13  A.   I'm not sure.  I can't recall her form of
14  method.
15  Q.   But you've seen her at the campaign office?
16  A.   Yes.
17  Q.   Has she made a political contribution to your
18  campaign?
19  A.   I'm not sure.
20  Q.   How about Linda Hawkins, has she done
21  political work for you?
22  A.   Yes.  In the past, yes.
23  Q.   And in what way has she done political work
24  for you?

Page 104

1   A.   Probably in communications, disseminating
2   information.
3   Q.   Like fliers?
4   A.   I would believe.
5   Q.   And how about Tyrone Rogers, has he done
6   political work for you?
7   A.   I'm sure he has done some political work.
8   Q.   Okay.  What sort of political work has
9   Tyrone Rogers done?
10  A.   Probably communicating with residents.
11  Q.   Going door to door?
12  A.   I'm not sure if he went door to door, but just
13  communicating with residents that he knows probably.
14  Q.   Do you know whether he's made any
15  contributions to your campaigns?
16  A.   I can't recall if he did.
17  Q.   Did the superintendent position pay $170,000?
18  A.   I believe when I first -- my first year was
19  $160,000, I think my -- my latter year could have been
20  $170.  Slightly underpaid with other superintendents.
21  Q.   Is that right?
22  A.   Yes.
23  Q.   Other comparables make more?
24  A.   I believe so, yes.

Page 105

1   THE WITNESS:  Can I use the washroom?
2   MR. SMITH:  Yeah, you can.
3   BY THE WITNESS:
4   A.   Yeah, if you -- you -- you look at Winnetka,
5   Schaumburg --
6   Q.   Did you say washroom?
7   A.   Yeah, can I take a washroom break?
8   Q.   Oh, yeah.  I thought you were still in the
9   middle of the answer.
10  A.   Oh, no, I'm sorry.
11  MR. WALSH:  Yeah, let's take a break.
12       (Discussion off the record.)
13  BY MR. WALSH:
14  Q.   Before the break I asked you some questions
15  about Tyrone Rogers, he was the president of the school
16  board for a period, correct?
17  A.   Yes.
18  Q.   And did Tyrone Rogers have any jobs at the
19  City of Harvey that you're aware of?
20  A.   Yes.
21  Q.   What jobs did he have?
22  A.   He was -- he worked with Metra parking lot
23  and -- yeah, Metra parking lot.
24  Q.   And what did he do at the Metra parking lot?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 13 of 16 PageID #:479

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 106..109

Page 106

1   A.   He looked over the entire city lot as well as
2   Metra lines in terms of, you know, ensuring that patrons
3   would come in and he would collect the -- the fees from
4   the individual patrons who utilized the lot.
5   Q.   And who gave him that position?
6   A.   You talking about -- I don't recall how --
7   Q.   You talking 2001, correct?
8   A.   You talking -- I think he was hired in
9   2003 and I believe he had -- when he first started, he
10  started in as an assistant and then he kind of -- was
11  kind of -- I don't recall exactly.
12  Q.   Did you appoint him to that position?
13  A.   Well, again, I know initially he -- that
14  wasn't the initial job he had in 2003, so...
15  Q.   Once he became the head of overseeing the city
16  Metra lot, was that a job that you placed him in?
17  A.   I believe so, yes.
18  Q.   Okay. And did Tyrone have some qualifications
19  that suited him for that position?
20  A.   Yeah, he was a great people person and he had
21  great skills in terms of working with the general
22  public.
23  Q.   Okay. At some point did you learn that
24  Tyrone Rogers was taking money from the Metra lot?

Page 107

1        MR. SMITH:   I'll object to the form of the
2   question.
3        THE WITNESS:   Taking money --
4        MR. WALSH:   Keeping money --
5        MR. SMITH:   Stealing --
6   BY MR. WALSH:
7   Q.   Stealing money from the Metra lot.
8   A.   When you say stealing from the Metra lot --
9   Q.   Uh-huh.
10  A.   -- I would have to say that I -- I can't
11  recall if -- if anyone ever, you know, indicated that he
12  was stealing money.
13  Q.   You don't recall one way or the other?
14  A.   I can't recall if they said he was actually
15  stealing money, but I know they put a new policy in
16  place regarding the handling of money, but I can't
17  recall.
18  Q.   And who put the new policy in place about
19  handling the money?
20  A.   I believe it was the chief of police.
21  Q.   Did anyone suggest to you that Tyrone Rogers
22  was taking money from the Metra lot -- stealing money?
23  A.   I can't recall anyone specifically saying that
24  he was stealing money.

Page 108

1   Q.   Did anyone say anything to that effect to you?
2   A.   Again, I can't recall if anyone specifically
3   was saying that he was stealing money.
4   Q.   Okay. If you knew that Tyrone Rogers was
5   stealing money from the Metra lot, is that something
6   that you would report to law enforcement?
7   A.   If anyone does anything that's illegal, I
8   would terminate and report to authorities.
9   Q.   Okay. Let's take a look at Exhibit 8, if you
10  wouldn't mind.
11       Paragraph 7 on Page 2.
12  A.   Okay.
13  Q.   And the preface to this is that this decision
14  is based upon reflection of the following and No. 7
15  says, Internal control, on several occasions we
16  identified an issue with deposits for Metra and commuter
17  parking lots, the administration refuses to reprimand
18  individuals who are responsible for those deposits.
19       Do you know if that refers to Tyrone Rogers?
20  A.   Again, I can't recall the specifics say who --
21  you know, in terms of this particular No. 7 you're
22  speaking to, but, again, as I indicated, anyone who --
23  that I suspect or if it was brought to me, you know, in
24  a formal charge, that certainly there will be

Page 109

1   consequences.
2   Q.   Have you been interviewed by any law
3   enforcement agency about Tyrone Rogers stealing money
4   from the Metra lots?
5   A.   No, sir.
6   Q.   Do you know whether Tyrone Rogers has been
7   interviewed by any law enforcement agency about stealing
8   money from the Metra lots?
9   A.   Not to my knowledge.
10  Q.   He hasn't told you that?
11  A.   Not to my knowledge.
12  Q.   Do you know whether a Harvey police officer
13  eventually had to accompany Mr. Rogers when he picked up
14  the money from the Metra lots?
15  A.   As I indicated earlier, there was some new
16  policies put in place by the chief of police regarding
17  not only Metra, but as well as the police department
18  when they're handling money.
19  Q.   And how did you learn this new policy?
20  A.   I believe Chief Eaves.
21  Q.   He told you?
22  A.   Yes.
23  Q.   Okay. Was that a face-to-face meeting or over
24  the phone?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 14 of 16 PageID #:480

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 110..113

Page 110

1  A.  I believe it was a face-to-face meeting.
2  Q.  Okay. And what did he say to you and what did
3  you say to him?
4  A.  I can't recall the context of the meeting.
5  Q.  Did he tell you why he was creating a new
6  policy for the Metra lot?
7  A.  I can't recall the context of the meeting.
8  Q.  Do you know if a police officer began to
9  escort Mr. Rogers?
10  A.  Pardon me?
11  Q.  Do you know whether a police officer began to
12  escort Mr. Rogers to pick up the Metra receipts?
13  A.  I know that there's a police officer escorting
14  Mr. Rogers and also any -- any time that they handle
15  money, there is a police officer escorting, you know,
16  the moneybag and wherever there's money.
17  Q.  Do you know which officer escorted Mr. Rogers?
18  A.  It's -- it's -- I'm not sure because I think
19  every day is a different officer I believe. I'm not --
20  I'm not sure exactly because sometimes I believe it
21  was -- I forgot his name -- Wright, I believe.
22  Q.  The officer?
23  A.  I believe his name was Wright.
24  Q.  Okay. Do you know whether the Metra receipts

Page 111

1  have ever been audited?
2  A.  I'm not sure.
3  Q.  Did you ever go to the Metra lot and count the
4  cars?
5  A.  No, not me.
6  Q.  Do you know of anyone who did?
7  A.  Possibly Ms. Lewis and Chief Eaves.
8  Q.  Drenia or Betty Lewis?
9  A.  Drenia.
10  Q.  And do you know why they went to count the
11  cars?
12  A.  I'm not specifically sure why.
13  Q.  Do you know when they went to count the cars?
14  A.  No, I can't recall the exact date.
15  Q.  Do you know what year?
16  A.  I can't recall the exact year.
17  Q.  Do you know if it was in 2013?
18  A.  I'm not sure.
19  Q.  How did you learn that Ms. Lewis and
20  Chief Eaves went to count cars at the Metra lot?
21  A.  I believe one of them told me.
22  Q.  Did they tell you why they were doing that?
23  A.  I can't recall the extent of the conversation.
24  Q.  Does Tyrone Rogers still collect money from

Page 112

1  the Metra lot?
2  A.  I believe with the accompaniment of the -- of
3  an officer as well as any individual who handles money
4  in the City of Harvey.
5  Q.  And Tyrone Rogers' wife I believe we already
6  established is Janet Rogers?
7  A.  Yes.
8  Q.  And she was on the school board in 2004; is
9  that correct?
10  A.  I'm not sure of the dates.
11  Q.  And I believe -- well, which -- did she do
12  political work for you?
13  A.  Yes.
14  Q.  Okay. And do you know whether she contributed
15  to your campaigns?
16  A.  I'm not sure.
17  Q.  And do you know whether she was convicted of
18  two felonies at some point?
19  A.  Yes.
20  Q.  Yes, she was?
21  A.  Yeah, but she has been pardoned, I believe.
22  Q.  Okay. And before she was -- Strike that.
23      When she was convicted, she stepped down as
24  president of the school board, correct?

Page 113

1  A.  Yes.
2  Q.  And did her husband replace her as president
3  of the school board?
4  A.  Well, the school board is basically voted upon
5  by the members of the board so he became the president,
6  I don't know if that would be considered replacing her.
7  Q.  And I believe you said she was pardoned,
8  correct?
9  A.  I believe so.
10  Q.  By Governor Quinn?
11  A.  I believe so.
12  Q.  Okay. And did you write a letter of support
13  for her?
14  A.  Yes, I did.
15  Q.  And now she's back on the school board?
16  A.  Yes, she is.
17  Q.  Did you play any part in her getting back on
18  the school board other than writing her letter of
19  pardon -- or seeking a pardon?
20  A.  I might have, you know, disseminated some
21  information pertaining to her reelection maybe.
22  Q.  And what do you mean by that, by disseminating
23  some information?
24  A.  Well, if someone asked me what -- what kind of

312.236.6963
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 15 of 16 PageID #:481

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 114..117

Page 114

1  person was she, you know, I can speak on the fact that I
2  recall when she was -- her son was playing football for
3  the Harvey coach and when he played for Thornton, I
4  always saw her as a very consciousness mom, I saw her as
5  an educator out in Bloomington Township and from what I
6  knew of her in terms of, you know, love and affection
7  that she showed the children of the community, but more
8  importantly, showed her own children and as an educator,
9  I would just speak on that behalf.
10     Q.  And you didn't have a problem with her being
11 on the school board with a felony?
12     A.  Well, that really wasn't my -- my -- my
13 decision, my call.  I couldn't make, you know --
14     Q.  Well, when you spoke on her behalf, you knew
15 she had a felony, right?
16     A.  No, in terms of when I spoke regarding
17 Ms. Thomas, I generally spoke over the course of the
18 years.
19     Q.  When you say Ms. Thomas, that's Janet Rogers'
20 maiden name, correct?
21     A.  It was Janet Thomas at the time, yes.
22     Q.  Okay.  Did you ever speak on her behalf -- or
23 I think you said disseminated information in order to
24 get her back on the school board, right?

Page 115

1     A.  Disseminate information to individuals who
2  would ask me relative to Ms. Thomas and I would give
3  them my interpretation of what I thought and what I felt
4  in regards to Ms. Thomas.
5     Q.  And did you feel that despite her felony
6  conviction she would still be a productive member of the
7  school board?
8     A.  Well, I think due to the fact -- the nature of
9  what she was being charged with -- I thought it involved
10 something with her son, but I can only speak on -- on
11 the fact of what I seen her in the community, how she
12 worked with the kids and her compassion and commitment
13 to children, so I spoke on that.
14     Q.  So do you, as you sit here today, think that
15 she's a good choice to be on the school board even
16 though she has two felony convictions?
17     A.  She don't have two felony convictions.
18     Q.  She was pardoned.
19         Do you think -- even though she was in the
20 past convicted of two felonies, do you think that she's
21 a good choice to be on the school board?
22     A.  Well, I mean, I think -- I -- I don't
23 discriminate against individuals who have felonies.  I
24 mean, they --

Page 116

1     Q.  They can still become productive members of
2  society?
3     A.  I think -- I believe so.
4         I mean, in every -- you know, I believe
5  everyone needs a second opportunity.
6     Q.  Right.
7         The felony that she was convicted of related
8  to schools, didn't it?
9     A.  It was something involving her son, I'm not --
10 I'm not --
11     Q.  Understanding her income in order to get a
12 student loan for her son?
13     A.  I don't understand -- I -- I wasn't -- I don't
14 really understand the total, you know, operations of
15 that.
16     Q.  Did you ever know what she was convicted of?
17     A.  It was something related to her son and I
18 believe a school loan or something like that.
19     Q.  Did you ever look to find out what she was
20 convicted of in more detail before you disseminated
21 information on her behalf?
22     A.  Well, I can only go by what she told me and I
23 can only go by what -- experiences that I had with her
24 and things that I saw her operating in the community.

Page 117

1         I mean, she -- she always seemed to be a very,
2  you know, high quality person when I saw her and so I
3  just -- was based on that.
4     Q.  Did you say you retired from being
5  superintendent?
6     A.  Yes.
7     Q.  Okay.  And how long before the -- or before
8  your contract was to expire did you retire?
9     A.  I think I -- I don't know the exact date, but
10 it was some months -- you know, my contract was up
11 June 30th, I believe, and so I retired June 30th.
12     Q.  Okay.  And did you receive a payout from the
13 school board when you retired?
14     A.  Yes, I did.
15     Q.  Okay.  And how much?
16     A.  I think it was about $240,000.
17     Q.  Okay.  And do you know why you received that
18 payout?
19     A.  Because at the time, you know, it was based
20 on -- if, in fact -- it was an early buyout associated
21 with my contract and at the time I was considering
22 extending my contract.
23     Q.  Uh-huh.
24     A.  And so there is -- you know, the board and I

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-2 Filed: 08/21/14 Page 16 of 16 PageID #:482

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 118..121

**Page 118**

1  mutually greed to the buyout.
2  Q. Now, you retired on the day that your contract
3  expired, correct?
4  A. Actually, the negotiations associated with the
5  buyout and the -- my -- my resignation was done
6  sometime, I believe, in January and February.
7  Q. Is that the time at which they decided to give
8  you the payout?
9  A. It was mutually agreed to -- you know,
10 stipulation associated with that particular buyout.
11 Q. Okay. Understood.
12    What I'm asking you though is that the time
13 frame, it was decided in January or February?
14 A. I believe it was -- I don't know the exact
15 date when we entered into the negotiations, but, again,
16 it was mutually negotiated by both parties.
17 Q. And did your sister vote in favor of that?
18 A. I don't know the -- or even recall who all
19 voted, but, again, it was mutually voted upon by -- by
20 the board and it was agreed by both parties.
21 Q. Do you know if anyone on the board abstained
22 from that vote?
23 A. I'm not sure.
24 Q. And do you know anyone that voted in favor of

**Page 119**

1  it?
2  A. Again, I'm not sure.
3  Q. Okay. And then did the school board make an
4  additional payment on your behalf to a State pension?
5  A. Again, it was a negotiated package that was
6  negotiated and both parties felt comfortable with the
7  negotiated package.
8  Q. Did they make a lump-sum payment of over
9  $100,000 to pension on your behalf at that time?
10 A. It was a negotiated settlement. It was a
11 settlement agreement.
12 Q. Do you know the amount?
13 A. Again, it was a negotiated settlement
14 agreement which both parties agreed.
15 Q. Do you know whether that settlement agreement
16 included a pension payment?
17 A. It was, again --
18 Q. I understand it was a negotiated settlement,
19 but I'm asking you, did the settlement agreement include
20 a pension payment?
21 A. I don't have the documents in front of me and,
22 again, this is -- I can't recall the exact stipulations
23 associated with that.
24 Q. Did you ask for a pension payment?

**Page 120**

1  A. Again, it was negotiated.
2  Q. Right.
3     When you were negotiating, did you ask for a
4  pension payment?
5  A. I can't recall if I did or didn't.
6  Q. Did you have a lawyer?
7  A. I believe I did, yeah.
8  Q. Who was it?
9  A. In terms of --
10 Q. Negotiating the --
11 A. No, no, no, at -- at -- during the -- no, I
12 was -- I don't recall. As a matter of fact, I don't
13 believe I had an attorney in attendance with me that
14 night.
15 Q. Okay. Who in the City of Harvey is in charge
16 of overseeing city spending?
17 A. Well, that's pretty broad.
18 Q. All right. Yeah, let me -- let me try to
19 narrow it down.
20    Is there a limit under which department heads
21 can spend money without seeking board approval?
22 A. I believe -- I believe there's a limit.
23 Q. Do you know what the number is?
24 A. I don't -- I don't recall the number right

**Page 121**

1  offhand.
2  Q. And then is there a separate procedure if a
3  department head wants to spend money over that limit?
4  A. Well, generally -- my understanding is that
5  when a department head has a request for expenditures,
6  that they were to submit those particular requests to
7  Ms. Lewis and Mr. Letke.
8  Q. Does your son work for Harvey?
9  A. When you say work for --
10 Q. Uh-huh.
11 A. My son -- he did some work for the City of
12 Harvey, he doesn't work for the city.
13 Q. Okay. And what sort of work did he do for the
14 City of Harvey?
15 A. He did some social media.
16 Q. And do you know what sort of social media he
17 did?
18 A. I believe it was Facebook and things of that
19 nature.
20 Q. And does your son live in Harvey?
21 A. No, he doesn't.
22 Q. And do you know how your son -- or strike
23 that.
24    Did he have a contract with the City of

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions