Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 1 of 17 PageID #:483

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 122..125

Page 122

Harvey?
A. I'm not sure in terms of -- you know, if he had a contract or not.
Q. And did you have to approve your son doing work for the City of Harvey?
A. No, generally if, in fact, individuals -- whether it's my son or any individual, they submit their bills to the city council for approval.
Q. Who made the decision to contract with your son?
A. Again, my son is no different from any other person contracting -- doing contracting services with the City of Harvey so I specifically don't know who makes the exact, you know, call on that, but, again, he's -- he did some work for the city as a social media strategy, I believe.
Q. Okay. And you don't know who approved?
A. Well, like I said, I can't really recall at this time who actually approved.
Q. Okay. And was your son paid for the work?
A. I'm quite sure, you know, he was paid. I don't know exact dollar figure.
Q. Okay. Do you know if it was in the area of $88,000?

Page 123

A. I don't know. I can't recall the exact dollar figure associated with that.
Q. Have you ever heard of Lola Grand?
A. Yes, I have.
Q. Okay. What is Lola Grand?
A. I believe it's a company associated with my son.
Q. Is it a corporation?
A. I'm not sure.
Q. Do you have an interest in Lola Grand?
A. No, I don't.
Q. Have you seen the work that your son did for Harvey?
A. I noticed that he had done some extensive work with the Facebook and he was very -- responsible for working with the citizens of Harvey in terms of providing city services.
    For example, there was one incident when a senior had to -- slipped on some ice and I guess they put it on Facebook and the department heads addressed that issue, but, again, he was handling social media.
Q. Does he live in Illinois?
A. No, he doesn't.
Q. Okay. So I thought you said that -- he didn't

Page 124

see someone slip on ice, he was told somebody slipped on ice or did you say he saw it?
A. No, someone responded on Facebook that they slipped on ice --
Q. Oh.
A. -- and then I guess he disseminated the information to put it on Facebook and put it -- gave it to the department head and the problem was corrected.
Q. Okay. Do you know Louis Farrakhan?
A. Yes, I do.
Q. And it's Minister Farrakhan, is that correct, or is that how you refer to him?
A. As Minister Farrakhan?
Q. Yes.
A. There's no particular way I refer to him.
Q. Okay.
A. Mr. Farrakhan.
Q. Okay. Have you ever contributed money to Mr. Farrakhan?
A. I don't recall.
Q. You don't know one way or the other?
A. I don't recall.
Q. And he is the head of the Nation of Islam, correct?

Page 125

A. Yes, sir.
Q. Are you a member of that organization?
A. No, sir, I'm a Christian.
Q. Okay. Do you know whether Mr. Farrakhan or the Nation of Islam has ever made a political contribution to you?
A. I'm not sure.
Q. Okay. Do you know whether Mr. Farrakhan or the Nation of Islam had done political work for you?
A. When you say political work --
Q. Same definition we have been using throughout the day.
A. I'm not sure in terms of extent, but I'm sure that -- and when we say Minister Farrakhan, it's not Minister Farrakhan who's doing the work, it's individuals who might reside in Harvey who -- religious affiliation may be Muslim or may be Catholic or may be, you know, Jewish or may be a missionary so they are no different from Christians doing work.
Q. Right.
A. And those individuals that work in -- you know, who live in the community.
Q. I understand.
    And I'm not calling attention to their

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 2 of 17 PageID #:484

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 126..129

Page 126

1 religious beliefs necessarily, I'm just discussing them
2 as an organization like any other organization.
3      Have the members of the Nation of Islam done
4 political work for you?
5   A.  Members such as -- there are some members --
6 whose religion is Muslim who have done some campaign
7 work for me.
8   Q.  How about members of the Nation of Islam?
9   A.  There's members who are Muslims who have done
10 some work for me just like there are Christians.
11   Q.  Have you ever asked members of the Nation of
12 Islam to be present at Harvey board meetings?
13   A.  I mean, it's individuals who live in the City
14 of Harvey who practice the faith of -- of being Muslim
15 or Christians and they live in Harvey and they're free
16 to come to a city council meeting to participate in the
17 democratic process.
18   Q.  Have you ever asked the members of the Nation
19 of Islam as a group to come to Harvey board meetings?
20   A.  Again, we -- I believe in -- in diversity of
21 all races and religions and colors and so I embrace, you
22 know, all religious, ethnic and sex -- I don't want to
23 say --
24   Q.  Genders?

Page 127

1   A.  Put it like that, genders, yeah.
2   MR. WALSH:  Do you mind repeating the question.
3      (Record read as requested.)
4 BY THE WITNESS:
5   A.  And, again, as I indicated, I open the city
6 council meeting to all walks of life no matter what your
7 religious -- you know, political affiliations are.
8   Q.  Would you agree that opening a meeting is --
9 being open is one thing, but asking someone to come is
10 another?
11   A.  Again, Christians, Catholics or any particular
12 origin or religious group are free to come to the city
13 council meeting.
14   Q.  Right.
15   A.  It's an open meeting.
16   Q.  Have you ever asked them to come?
17   A.  Again, I can't -- specifically indicate that I
18 have asked them solely, but, again, like I said, it's an
19 open meeting.
20   Q.  When you say solely -- you understand what I'm
21 trying to get at here, I'm asking --
22   A.  And I'm trying to --
23   Q.  -- if you've ever asked the Nation of Islam as
24 a group to come to a Harvey board meeting.

Page 128

1   A.  Again, I -- I can't recall asking in its
2 entire Nation of Islam to come to a meeting. I just say
3 it's an open meeting and no matter what your religious
4 affiliation is, you're welcome to come.
5   Q.  Members of the Nation of Islam -- or a lot of
6 them wear suits and a bow tie; isn't that correct?
7   A.  Not necessarily. If -- you know, it's a
8 fashion. I mean, I have seen several lawyers who happen
9 to be of various, you know, races today wearing
10 bow ties --
11   Q.  Correct.
12   A.  -- so I can't really discriminate and say that
13 only members of the Nation of Islam wear bow ties.
14   Q.  I didn't say only, but it's common for members
15 of the Nation of Islam to wear suits and bow ties; isn't
16 that correct?
17   A.  Well, I mean, I've seen members of the Muslim
18 community wear straight ties so, I mean, I can't
19 specifically just say that they only wear bow ties.
20   Q.  I understand.
21      Okay. So you don't know?
22   A.  I mean, I -- again, I don't know what their
23 exact wardrobe -- I can't speak to their exact wardrobe.
24   Q.  Okay. Do you know Mustapha Farrakhan?

Page 129

1   A.  Yes, I do.
2   Q.  Okay. And who is Mustapha Farrakhan?
3   A.  Mustapha Farrakhan is a part-time employee of
4 the City of Harvey.
5   Q.  And he's Minister Farrakhan's son?
6   A.  Yes, he is.
7   Q.  Okay. And has Mustapha Farrakhan ever done
8 political work for you?
9   A.  I can't recall if he has.
10   Q.  Have you ever seen him at your campaign
11 office.
12   A.  I can't recall if I ever saw him.
13   Q.  Do you know if he's ever made a campaign
14 contribution to you?
15   A.  I can't recall if he has.
16   Q.  He is a part-time police officer; is that
17 correct?
18   A.  That's correct.
19   Q.  And when did he start as a part-time police
20 officer?
21   A.  I don't know the exact date.
22   Q.  Do you know his rank?
23   A.  I don't -- again, that's -- that's a police
24 matter. The Chief of Police would handle that.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 3 of 17 PageID #:485

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 130..133

Page 130

1  Q. Okay. So do you know his rank?
2  A. Again, he's the police chief with -- to handle
3  his rank.
4  Q. Do you have part-time officers that have ranks
5  other than police officer?
6  A. I'm not -- I'm not sure.
7  Q. Okay. Is he a friend of yours?
8  A. When you say -- I -- I would consider Mustapha
9  a friend of mine.
10 Q. And have you ever discussed his duties at the
11 police department?
12 A. That's not my concern. There's a chief to --
13 that oversees the police department.
14 Q. I'm just asking if you've ever discussed it
15 with him.
16 A. That's not my concern, the chief handles --
17 Q. I understand that and, you know, I have
18 friends that are police officers and I ask what they do,
19 but I'm not their chief.
20 A. Okay.
21 Q. What I'm asking you is have you ever talked to
22 him about what he does at the police department?
23 A. Again, the chief of police is responsible for
24 Mustapha Farrakhan.

Page 131

1  Q. Right.
2     And have you ever asked him about his duties?
3  A. Again, whenever Mustapha and I get together,
4  it's really on an intellectual or spiritual, you know,
5  conversation or what we can do to, you know, help the
6  community.
7  Q. Okay. Is it true that Mustapha Farrakhan
8  hasn't worked in Harvey since 2008?
9  A. I can't speak to that.
10 Q. You don't know one way or the other?
11 A. I can't -- well, again, that -- that would
12 have to be answered by the chief of police.
13 Q. Have you -- have you spoke with -- Strike
14 that.
15    Have you seen him working since 2008 in the
16 City of Harvey?
17 A. I've -- I've seen Mustapha working.
18 Q. As a police officer?
19 A. I've seen him working as a police officer with
20 other police officers, yes.
21 MR. SMITH: Object to the form of the question.
22          When?
23 MR. WALSH: Since 2008.
24

Page 132

1  BY THE WITNESS:
2  A. I mean, since his employment, I've -- I've
3  seen --
4  Q. I'm asking since 2008, have you seen him
5  working as a police officer for the City of Harvey?
6  A. Again, I have seen him in his capacity as --
7  riding in a police vehicle with other officers.
8  Q. Doing Harvey police work or in a motorcade for
9  his father?
10 A. A motorcade for his father?
11    I'm not -- I'm talking about specific to
12 Harvey.
13 Q. Okay. So since 2008 you've seen him do police
14 work?
15 A. I've seen him do some police work, yes.
16 Q. Okay. What sort of police work?
17 A. Again, I can't specifically speak to the
18 exact, you know, duties and observation -- you know,
19 things that I've seen him do, but I've seen him, you
20 know, serving in the capacity as a police officer.
21 Q. Does Mustapha Farrakhan get a take-home car?
22 A. Again, those things would have to be addressed
23 to the chief of police.
24 Q. You don't know one way or the other?

Page 133

1  A. Those things need to be addressed from the
2  police chief.
3  Q. I'm asking you if you know one way or the
4  other, not what the police chief knows and not what the
5  police chief oversees, I'm asking if you know whether he
6  gets a take-home car.
7  A. Again, that specific answer would have to be
8  from the chief of police.
9  Q. I'm asking you about your personal knowledge,
10 whether you know if Mustapha Farrakhan gets a take-home
11 vehicle.
12 A. Again, I don't recall if he had a take-home
13 vehicle or not.
14 Q. You don't know?
15 A. I can't recall.
16 Q. Okay. Do you know of any part-time police
17 officers that get take-home cars in the City of Harvey?
18 A. I couldn't specifically speak to that.
19 Q. What do you mean you can't speak to it?
20 A. I can't recall if I knew any.
21 Q. Do you know if Mustapha Farrakhan uses a
22 Harvey police car to lead -- what's the word I want to
23 say -- procession -- what's the word, driving around in
24 a --

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 4 of 17 PageID #:486

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 134..137

Page 134

1   A.   Motorcade?
2   Q.   Yeah, motorcade.
3        Do you know if he uses a Harvey police car for
4   a motorcade for his father?
5   A.   I've never seen it.
6   Q.   Do you know whether it occurs?
7   A.   I've never seen it.
8   Q.   Have you ever been told that it occurs?
9   A.   I've never seen it.
10  Q.   Earlier we spoke about Alex Gbur's case.
11  A.   Uh-huh.
12  Q.   Yes?
13       Just so she can get a record.
14  A.   Yes.
15  Q.   Okay. And did you give a deposition in that
16  case?
17  A.   I did.
18  Q.   Okay. And you testified at trial?
19  A.   Yes, I did.
20  Q.   Okay. Do you remember when the trial was?
21  A.   I can't recall the exact dates.
22  Q.   Do you remember the year?
23  A.   Maybe last year.
24  Q.   In or near 2008 did the City of Harvey decide

Page 135

1   to invest in a hotel?
2   A.   I'll plead the Fifth on that.
3   Q.   Okay. And was the hotel in Harvey?
4   A.   I'll plead the Fifth on that.
5   Q.   Okay. Was the hotel near where Halsted and
6   I-80 intersect?
7   A.   I'll plead the Fifth on that.
8   Q.   Okay. Do you know the address of the hotel
9   that Harvey was going to invest in?
10  A.   I plead the Fifth on that.
11  Q.   Okay. For these questions I'm going to refer
12  to the investment in the hotel as the Harvey hotel deal.
13       What was the purpose of the Harvey hotel deal?
14  A.   I plead the Fifth on that.
15  Q.   Was Harvey involved in rehabbing or purchasing
16  the hotel?
17  A.   I'll plead the Fifth on that.
18  Q.   And do you know whether the hotel was seeking
19  a Holiday Inn franchise license?
20  A.   I'll plead the Fifth on that.
21  Q.   Do you know if Harvey was to have a financial
22  interest in this hotel?
23  A.   I'll plead the Fifth on that.
24  Q.   Did Joe Letke first suggest to you to invest

Page 136

1   in the hotel?
2   A.   I'll plead the Fifth on that.
3   Q.   Whose idea was it to invest in the -- for
4   Harvey to invest in the hotel?
5   A.   I plead the Fifth on that.
6   Q.   Do you know whether Jerry Genova was working
7   on the Harvey hotel deal with Letke?
8   A.   I wouldn't know that.
9   Q.   You don't know?
10  A.   No, I wouldn't know that.
11  Q.   Okay. Did Joe Letke ever speak to you about
12  Jerry Genova in terms of the Harvey hotel deal?
13  A.   Best of my recollection I never had a
14  conversation relative to that.
15  Q.   Okay. Did you ever speak to Alderman Givens
16  about the Harvey hotel deal?
17  A.   I plead fifth on that.
18  Q.   Did Alderman Givines ever tell you that he had
19  met with Jerry Genova about the Harvey hotel deal?
20  A.   Best of my recollection, I've never had a
21  conversation in which -- pertaining to that.
22  Q.   Okay. What was the conversation with
23  Mr. Givines about?
24  A.   Mr. Givines and I have -- a lot of

Page 137

1   conversation with Mr. Givines in terms of -- he talks
2   about his kids, he talks about Harvey in terms of, you
3   know, things that he can do to improve our --
4   Q.   Did you ever talk to Alderman Givines about
5   approving the Harvey hotel deal?
6   A.   I don't ever recall having a conversation with
7   Mr. Givines pertaining to that.
8   Q.   Who did you speak with about the Harvey hotel
9   deal?
10  A.   I plead the Fifth on that.
11  Q.   Did you ever speak with Chris Galloway about
12  the Harvey hotel deal?
13  A.   I'll plead the Fifth on that.
14  Q.   Did you ever speak to Maggie Britton about the
15  Harvey hotel deal?
16  A.   I plead the Fifth on that.
17  Q.   Did you discuss in -- did you discuss the
18  Harvey hotel deal with any other aldermen?
19  A.   I plead the Fifth on that.
20  Q.   Did Harvey issue municipal bonds to raise
21  capital for the hotel deal?
22  A.   I plead the Fifth on that.
23  Q.   How much money did Harvey receive as a result
24  of the bond issues for the hotel project?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 5 of 17 PageID #:487

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 138..141

Page 138

1   A.   I plead the Fifth on that.
2   Q.   Was it ten million?
3   A.   I plead the Fifth on that.
4   Q.   Did approximately 1.7 million of the proceeds
5   from the bond issue go into Harvey's general fund?
6   A.   I plead the Fifth on that.
7   Q.   Does the -- did the Dixie Square Mall area
8   have a TIF district?
9   A.   I plead the Fifth on that.
10  Q.   Did Harvey transfer money from the Dixie
11  Square TIF over to the general -- or strike that --
12  over -- or into the general fund to cover for the
13  money -- the bond proceeds -- Strike that.
14       Did Harvey transfer -- hold on.  I'll get back
15  to that in one second.
16       Who made the decision to put the bond proceeds
17  into that general fund?
18  A.   Fifth.
19  Q.   Who -- was Joseph Letke paid a commission from
20  the bond issue?
21  A.   Fifth.
22  Q.   Did you ever receive anything of value from
23  the bond issue?
24  A.   Fifth.

Page 139

1   Q.   Do you know who authorized Joseph Letke or
2   Letke & Associates to receive proceeds from the bond
3   issue?
4   A.   Fifth.
5   Q.   Do you know whether Jerry Genova did any work
6   on the Harvey hotel deal?
7   A.   Fifth.
8   Q.   Do you know Satish Gabhawala?
9   A.   Fifth.
10  Q.   Do you also know him by Sunny?
11  A.   Fifth.
12  Q.   Do you know whether Joseph Letke represented
13  Satish Gabhawala in the Harvey hotel deal?
14  A.   Fifth.
15  Q.   When did you first meet Satish Gabhawala?
16  A.   Fifth.
17  Q.   Did Satish Gabhawala ever do political work
18  for you?
19  A.   Fifth.
20  Q.   Did Satish Gabhawala ever make political
21  contributions to you?
22  A.   Fifth.
23  Q.   Do you know whether he was the developer of
24  the Harvey hotel deal?

Page 140

1   A.   Fifth.
2   Q.   Over what years did Harvey issue bonds to
3   raise capital for the Harvey hotel deal?
4   A.   Fifth.
5   Q.   Do you know whether Mr. Genova ever discussed
6   the Harvey hotel deal with Satish Gabhawala?
7   A.   Fifth.
8   Q.   Do you know how much -- how much of the bond
9   proceeds Satish Gabhawala received from the Harvey hotel
10  deal?
11  A.   Fifth.
12  Q.   Did you have to approve Satish Gabhawala
13  receiving proceeds from the bond issue?
14  A.   Fifth.
15  Q.   Did you ever receive anything of value from
16  Mr. Gabhawala in exchange for him receiving bond
17  proceeds?
18  A.   Fifth.
19  Q.   Did Mr. Letke ever give you anything of value
20  in return for receiving bond proceeds?
21  A.   Fifth.
22  Q.   Was the hotel ever constructed?
23  A.   Fifth.
24  Q.   Did you face a lot of political scrutiny

Page 141

1   because of the Harvey hotel deal?
2   A.   Fifth.
3   Q.   Have you been interviewed by any law
4   enforcement agencies about the Harvey hotel deal?
5   A.   Fifth.
6   Q.   By early 2010, were you concerned your
7   political opponents could capitalize on the problems
8   with the Harvey hotel deal?
9   MR. SMITH:  Object to the form of the question.
10  The question calls for speculation.
11       You can answer, if you understand it.
12  BY THE WITNESS:
13  A.   Fifth.
14  MR. WALSH:  Did you get the objection and the
15  answer?
16  MS. COURT REPORTER:  Uh-huh.
17  BY MR. WALSH:
18  Q.   Did you tell Joe Letke you didn't want
19  Jerry Genova working on the Harvey hotel deal?
20  A.   Fifth.
21  Q.   Have you ever heard of a group called the
22  Mayor's Intelligence Agency?
23  A.   Yes.
24  Q.   What is that?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 6 of 17 PageID #:488

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 142..145

Page 142

1   A.   It's not -- it's not in existence any longer.
2   Q.   Okay.  What was it?
3   A.   Just basically like a community policing
4   organization.
5   Q.   But did it do any political work?
6   A.   Basically the mayor's organization -- the
7   mayor's intelligence organization was probably
8   defunct -- it's been defunct now about five or six years
9   in terms of the -- it was just basically one person,
10  Princeton Fields, who is deceased now.
11  Q.   Okay.  And did -- did the mayor's intelligence
12  agency do any political work?
13  A.   The mayor -- not per se the mayor's
14  intelligence agency.  There was really no agency, it was
15  really basically Mr. Princeton Fields.
16  Q.   Okay.  Did he do political work for you?
17  A.   At times, yes.
18  Q.   Was he a police officer?
19  A.   No, he wasn't.
20  Q.   Okay.  Civilian?
21  A.   Yes.
22  Q.   Did he have a Harvey car that said mayor's
23  intelligence agency on the side of it?
24  A.   It was more like community relations.

Page 143

1   Q.   Do you know Javon Patterson?
2   A.   Who?
3   Q.   Javon Patterson.
4   A.   I don't specifically know him, but I think it
5   was -- it was a lawsuit involving the City of Harvey.
6   Q.   Did you ever meet Javon Patterson?
7   A.   I don't recall ever meeting him.
8   Q.   Did you ever see him in an interrogation room?
9   A.   I -- I -- in an interrogation -- I plead the
10  Fifth.
11  Q.   Okay.  Did you ever tell Javon Patterson to
12  give you back your cocaine?
13  A.   You know --
14  Q.   I mean --
15  A.   Wow.
16  Q.   Well, that was the allegation of the lawsuit,
17  wasn't it?
18  A.   I -- I plead the Fifth.
19  Q.   The city settled his case; is that correct?
20  A.   Yes, I believe so.
21  Q.   Okay.  For $1.4 million?
22  A.   I'm not sure -- exactly sure of the terms.
23  MR. WALSH:  What do you need?
24  MR. SMITH:  Actually, the city was dismissed from

Page 144

1   that case.
2   MR. WALSH:  Oh.
3   MR. SMITH:  There were other defendants.  I
4   represented the city and we got out of that case.
5   MR. WALSH:  Okay.  Okay.  And, honestly, I
6   appreciate that clarification.
7        So the case was settled for that amount from
8   somebody?
9   MR. SMITH:  Yeah, I mean, how as to well and some
10  of the other individuals that's in this --
11  MR. WALSH:  Okay.
12  MR. SMITH:  -- but the city was out.  We got out of
13  the case.
14  MR. WALSH:  Okay.  I would want to put that on the
15  record too, if I got out.
16       Congratulations.
17  BY MR. WALSH:
18  Q.   Okay.  Do you know a Kim Wash?
19  A.   Yes.
20  Q.   Is she -- Strike that.  I'm going to back up
21  for a second here.
22       I'll show you what I'm going to mark as
23  Exhibit No. 9.
24

Page 145

1        (Kellogg Deposition Exhibit No. 9
2        marked as requested.)
3   MR. WALSH:  Thank you.
4   THE WITNESS:  Thank you.
5   MR. SMITH:  Thank you.
6   BY MR. WALSH:
7   Q.   Do you recognize Exhibit No. 9?
8   A.   The best of my recollection, no.
9   Q.   Have you ever heard of Ed Weathersby & Sons
10  Plumbing?
11  A.   Yes.
12  Q.   Okay.  And were they contractors with the City
13  of Harvey?
14  A.   Yes.
15  Q.   And did you have a billing problem with
16  Ed Weathersby & Sons, in other words, unpaid bills?
17  A.   There were some discrepancy.
18  Q.   Okay.  And do you know whether Mr. Genova
19  worked on the Weathersby case on behalf of the City of
20  Harvey?
21  A.   I couldn't speak to that, I can only speak to,
22  you know, Mr. Letke and individuals up under his
23  umbrella.  I don't know who he has up under his
24  umbrella.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 7 of 17 PageID #:489

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 146..149

Page 146

1  Q. Okay. Do you mind taking a look at Page 2 of
2  this letter.
3  A. Okay.
4  Q. You see it's written by
5  Christopher D. Galloway, general counsel.
6  A. I do.
7  Q. And you see what's carbon copied to it.
8  A. Okay.
9  Q. Yourself.
10 A. Uh-huh.
11 Q. Mr. Letke.
12 A. Okay.
13 Q. And Jerry Genova.
14 A. Okay.
15 Q. Does that refresh your recollection as to
16 whether Mr. Genova worked on this case or this issue?
17 A. It still -- it still wouldn't mean anything to
18 me due to the fact that Mr. Letke has an accounting
19 firm, that he's privileged to hire anyone that he wants
20 to hire in terms of -- so just because Mayor Genova's
21 name is associated with this, doesn't mean -- you know,
22 lead any credence to believe he worked with the City of
23 Harvey. He worked as a part of his firm, so...
24 Q. Okay. Just so we get a clear record, I'll

Page 147

1  show you what I'll mark as Exhibit 10.
2           (Kellogg Deposition Exhibit No. 10
3            marked as requested.)
4  THE WITNESS: Thank you.
5  MR. SMITH: Thank you.
6  BY MR. WALSH:
7  Q. Do you recognize Exhibit No. 10?
8  A. Okay. Yes.
9  Q. Okay. This was -- let me -- what do you
10 recognize it to be?
11 A. It's a consolidated election form that shows
12 the -- I believe the vote totals.
13 Q. Uh-huh.
14 A. Uh-huh.
15 Q. For 2003?
16 A. Yes.
17 Q. Okay. And it shows you running against
18 Nick Graves?
19 A. I believe --
20 Q. You see that on the right-hand column?
21 A. Yes, I do.
22 Q. Okay. And does that accurately reflect, to
23 the best of your recollection, the vote count in the
24 2003 election between you and Nick Graves?

Page 148

1  A. It doesn't accurately reflect.
2  Q. It does not?
3  A. Due to the fact it did say there was outside
4  vote fraud.
5  Q. Oh, there was?
6  A. I mean --
7  Q. There were allegations of voter fraud?
8  A. Absolutely. So, I mean, technically I --
9  didn't really thought I lost in '99 to be honest with
10 you.
11 Q. This is 2003.
12 A. Okay.
13 Q. I got news for you, you won.
14 A. Oh, okay. Right. Okay. I thought you
15 said -- I thought you just said '99. Okay. 2003, okay.
16 Q. Okay. You believe there was voter fraud in
17 '03?
18 A. No, '99.
19    Right, right, right.
20    Okay. Yes, yes, this accurately reflects --
21 yes, okay. Let the record reflect, I'll take this
22 victory.
23 Q. You got that down, right?
24 A. Right, right, right.

Page 149

1  Q. Voter fraud in '03.
2  A. No, no, no.
3  Q. Just kidding. Just kidding.
4  A. Right, right, right, right.
5  Q. Okay. So back to Kim Wash.
6     Is -- you know Kim Wash, correct?
7  A. Yes, I do.
8  Q. Okay. Is she a relative of yours?
9  A. No, sir.
10 Q. Is her husband, Tony Wash, a relative of
11 yours?
12 A. No.
13 Q. And how did you meet Kim Wash?
14 A. I don't recall how and when and where I met
15 Ms. Wash.
16 Q. Were you ever a part owner or investor in the
17 Joe Rivers Center?
18 A. No, sir.
19 Q. Is Ms. Wash a political supporter of yours?
20 A. I would believe so.
21 Q. Has she done political work for you?
22 A. I can't recall if she did.
23 Q. Has she -- have you ever seen her at your
24 campaign office?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 8 of 17 PageID #:490

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 150..153

Page 150

1    A.   I don't recall ever seeing her there.  I can't
2  recall.  I might have.  I don't know.  I'm not sure.
3    Q.   Has she contributed money to your campaigns?
4    A.   I'm sure that -- I would believe that she
5  might have.
6    Q.   I'll show you what we will mark as Exhibit 11.
7              (Kellogg Deposition Exhibit No. 11
8               marked as requested.)
9    THE WITNESS:  Thank you.
10   MR. WALSH:  I only have one copy.  I apologize.
11   MR. SMITH:  That's fine.
12   BY MR. WALSH:
13   Q.   Do you recognize that document?
14   A.   Yes.
15   Q.   Have you seen that format before?
16   A.   Yes.
17   Q.   Okay.  And that shows -- it's from the
18  Illinois Board of Elections?
19   A.   Yes.
20   Q.   And it shows campaign contributions between
21  Kim Kenner Wash --
22   A.   Uh-huh.
23   Q.   -- and citizens to elect Eric J. Kellogg.
24   A.   Yes.

Page 151

1    Q.   And do you know if Ms. Wash's maiden name is
2  Kenner?
3    A.   I'm not -- I don't -- I can't recall her
4  maiden name.
5    Q.   Okay.  Has her husband, Tony Wash, done
6  campaign work for you?
7    A.   Best of my recollection, I can't recall him
8  doing any campaign work for me.
9    Q.   And when you say you can't recall, does that
10  mean you don't know one way or the other or you don't
11  think --
12   A.   No, I don't ever recall seeing Tony do any
13  campaign work.
14   Q.   Okay.  Did Kim Wash recently open a club in
15  Harvey called Assets?
16   A.   I believe she did, yes.
17   Q.   Okay.  And was it a strip club?
18   A.   It was a bar and grill from my understanding.
19   Q.   And when she applied for the permit, did she
20  apply as a strip club or as a bar and grill?
21   A.   As a bar and grill.
22   Q.   Okay.  And did you later come to learn that it
23  was a strip club?
24   A.   Yes.

Page 152

1         Well, there was a news story that broke and
2  upon the knowledge of that, she was closed down.
3    Q.   Did you review the application before the club
4  opened?
5    A.   That's not my area of expertise; we have a
6  planning director who handles that.
7    Q.   Okay.  And that may be true, but I'm asking
8  you if you reviewed it?
9    A.   I wouldn't have no need to, I rely on the area
10  of specialists.
11   Q.   Okay.  Did you discuss opening the club with
12  her?
13   A.   Me opening the club with Ms. Wash?
14   Q.   Did you discuss the fact that she was going to
15  open up the club?
16   A.   I don't recall having a conversation with
17  Ms. Wash relative to that particular club.
18   Q.   Is she a close friend of yours?
19   A.   I wouldn't consider her a close friend, she's
20  a business owner in town.
21   Q.   Okay.  Has she ever provided anything of value
22  to you?
23   A.   Only donations to my campaign.
24   Q.   And, I'm sorry, not to get into this topic

Page 153

1  again, but at the services for your -- when your mother
2  passed, did Kim Wash provide the food for the service
3  free of charge?
4    A.   I don't know the details of that.  I just --
5  because at the time I was grieving so there was a host
6  of individuals who provided a lot of different things,
7  but I couldn't really specifically say if, in fact, she
8  did or she didn't because I was grieving.
9    Q.   Okay.  Do you know Donald Luster?
10   A.   Yes, I do.
11   Q.   And does Donald Luster work for Harvey?
12   A.   He's a contractor.
13   Q.   Okay.  And what sort of work does he do as a
14  contractor?
15   A.   He does just a variety of issue -- of things.
16  He's -- he's helping out in various administrative --
17  well, I'll just say he works in an administrative
18  capacity.
19   Q.   Pardon me.
20   A.   He's helping fill some -- some gaps in -- in
21  various areas working in, you know, the plans -- he
22  assisting in the planning department and he assists in
23  the planning department as of now.
24   Q.   Okay.  And do you know what kind of work he

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 9 of 17 PageID #:491

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 154..157

Page 154

1 does in the planning department?
2  A. Well, he certainly holds economic development
3 meetings with prospective individuals who are seeking to
4 come into the City of Harvey.
5  Q. Okay. Has he ever done political work for
6 you?
7  A. I can't recall if -- if Donnie Luster has done
8 some political work for me.
9  Q. You don't recall one way or the other?
10  A. I don't -- I can't really recall seeing him in
11 my campaign office.
12  Q. Okay. Do you know if he's ever made campaign
13 contributions to you?
14  A. I'm -- I'm not sure.
15  Q. Has he ever had an office in City Hall?
16  A. No, he doesn't have an office in City Hall.
17  Q. How about -- do you -- is he a reverend?
18  A. Yes.
19  Q. Okay. And does he hold services in a city
20 owned building?
21  A. Let me -- I need to validate that.
22  Q. Okay. Oh, you mean you need to look into it?
23  A. Yes.
24  Q. You don't know one way or the other?

Page 155

1  A. In terms of -- because I -- I have never
2 attended service there, you know, but let me --
3  Q. Were you ever told that he conducts religious
4 services in a city building?
5  A. I can't recall if anyone ever told me, but,
6 again, I certainly will -- will look into the fact and
7 see if, in fact, that's occurring.
8  Q. Okay. Earlier you said you'd never been to
9 the services.
10  A. Yeah.
11  Q. Okay. So which services were you talking
12 about?
13  A. You said he was the minister.
14  Q. Uh-huh.
15  A. Okay. And so -- and you said I would -- I
16 would assume that you were talking about services at
17 a -- at a church.
18  Q. Uh-huh.
19  A. Right. Now, let me backtrack and say he did
20 have a church on 159th and Lincoln, which I did attend
21 services there.
22  Q. Uh-huh.
23  A. Something he was having over at the -- at his
24 church.

Page 156

1  Q. Is that a city owned building?
2  A. I don't recall if that was a city owned
3 building.
4  Q. Okay.
5  A. Because --
6  Q. Have you ever heard of Tri-Sphere
7 Construction?
8  A. Yes, I have.
9  Q. And do you know whether Tri-Sphere
10 Construction has ever donated to your political
11 campaigns?
12  A. I'm not sure.
13  Q. Do you know whether any individuals at
14 Tri-Sphere Construction have done political work for
15 you?
16  A. I'm not sure.
17  Q. What sort of -- but they're contractors with
18 Harvey?
19  A. Yes.
20  Q. What sort of work do they do?
21  A. I believe they assist with lawn care.
22  Q. Okay. Do you know who Sandra King is?
23  A. Sandra King?
24  Q. Uh-huh.

Page 157

1  A. Sandra King?
2  Q. Does she own or operate a towing company in
3 Harvey?
4  A. Oh, okay, yeah. She -- her husband is Ed --
5 Ed. Well, he's deceased now, Ed King.
6  Q. Ed King.
7  A. Correct.
8  Q. Okay. And what's their towing company called?
9  A. I believe it's Ed's Towing.
10  Q. Okay. And do they do the towing in Harvey?
11  A. Yes.
12  Q. Okay. And who authorized them to do the
13 towing in Harvey?
14  A. Well, the towing authorization, which has been
15 consistent with -- when Mayor Graves was the mayor, when
16 he appointed his son to have the towing contract, so it
17 was appointed by the -- by the mayor.
18  Q. So it's been the same -- it's been the same --
19 or it's Ed's Towing you said?
20  A. Right.
21     Well, prior to that it was -- it was
22 Mayor Graves' son.
23  Q. Okay. When was Ed's Towing given the
24 contract?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 10 of 17 PageID #:492

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 158..161

Page 158

1   A.   I believe in 2003, I believe.
2   Q.   And did you do that?
3   A.   I believe that was one of my appointments.
4   Q.   Okay.  And are you related to anyone who works
5   at Ed's Towing?
6   A.   No.
7   MR. WALSH: We are on No. 12, right?
8            (Kellogg Deposition Exhibit No. 12
9             marked as requested.)
10  BY MR. WALSH:
11  Q.   Okay.  This is just --
12  A.   Okay.
13  Q.   Do you recognize that document?
14  A.   Yes.
15  Q.   And, just for the record, I have a highlight
16  on there that I made.
17  A.   Uh-huh.
18  MR. WALSH: And I only brought one copy so, I
19  apologize, we can get another copy if need be in the
20  future.
21  BY MR. WALSH:
22  Q.   But do you see a donation there from
23  Sandra King?
24  A.   Yes.

Page 159

1   Q.   Okay.  I'm going to mark this as Exhibit 13.
2            (Kellogg Deposition Exhibit No. 13
3             marked as requested.)
4   BY MR. WALSH:
5   Q.   Sorry about this.
6   A.   No problem.
7   Q.   Page 2 at the top, is that your attorney
8   today --
9   A.   Yes.
10  Q.   -- making $1,000 contribution?
11  A.   Yes.
12  Q.   Okay.  I'm going to mark this as 14.
13           (Kellogg Deposition Exhibit No. 14
14            marked as requested.)
15  BY MR. WALSH:
16  Q.   Okay.  This is Exhibit 14, let me know if you
17  recognize that.
18  A.   Yes.
19  Q.   And on Page, I believe, 2, you see your
20  brother on there -- or maybe on Page 3.  Is that your
21  brother?
22  A.   Yes.
23  Q.   Derrick Muhammad.
24       Oh, does your brother, Derrick Muhammad, work

Page 160

1   for Kim Wash?
2   A.   I mean, best of my recollection, I don't know.
3   Q.   Were you asked to provide any documents for
4   this litigation?
5   A.   Documents such as?
6   Q.   Any documents.  Were you asked to try to
7   collect any documents?
8   A.   No.
9   Q.   I'm just going to mark this as 15.
10           (Kellogg Deposition Exhibit No. 15
11            marked as requested.)
12  BY MR. WALSH:
13  Q.   Do you recognize that document?  Do you
14  recognize the document?
15  A.   Yes.
16  Q.   Okay.  And when is the first time you saw that
17  document?
18  A.   I couldn't say.  I can't recall the exact
19  date.
20  Q.   Okay.  Earlier you testified you were not
21  asked to get any documents in this case, correct?
22  A.   Was I asked to get any documents?
23  Q.   Uh-huh.
24  A.   Okay.  Well, the way you phrased the question,

Page 161

1   you --
2   Q.   Pardon me.
3   A.   The way that you phrased the question, were
4   you asked to give any documents, as if I was supposed
5   to, and, you know, my understanding was that you was
6   asking me did I go to different individuals to obtain
7   documents --
8   Q.   Uh-huh.
9   A.   -- relative to this case and that was my
10  answer in terms of -- you know, now if you rephrasing it
11  or you're trying to, you know -- you know, rephrase it
12  now.
13  Q.   Well, what did you do in terms of trying to
14  get documents for this case?
15  A.   Well --
16  Q.   What?
17  A.   What did I do personally?
18  Q.   Uh-huh.
19       Did you do nothing?
20  A.   I don't recall doing anything in terms of, you
21  know, obtaining any documentation for this case.
22  Q.   Okay.  Did you ever discuss this case with
23  Sonya Little (phonetic)?
24  A.   Who's Sonya Little?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 11 of 17 PageID #:493

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 162..165

Page 162

1   Q.   Is that the name?
2        MR. SMITH: Are you referring to Sonya London?
3   BY MR. WALSH:
4   Q.   Sonya London. I'm sorry. Sonya London.
5        Do you know who Sonya London is?
6   A.   Yes.
7   Q.   Okay. Who is Sonya London?
8   A.   She works in the human resource department.
9   Q.   Okay. Did you ever discuss this case with
10  Sonya London?
11  A.   To the best of my recollection, I never had a
12  conversation with Sonya London pertaining to this.
13  Q.   And her name is Sonya?
14  A.   Sonya London.
15  Q.   Okay. Do you know who Brian Hynes is?
16  A.   Brian Hynes?
17       Maybe you can refresh my memory, I don't --
18  Q.   I wish I could, I don't know who it is, I'm
19  asking you.
20  A.   No, that's the first -- Brian Hynes?
21  Q.   Okay. Do you know how much Joseph Letke
22  billed the City of Harvey for his services between 2008
23  and 2001?
24  A.   Fifth. I'll take the Fifth.

Page 163

1   Q.   Did Joseph Letke ever discuss the quality of
2   work that Jerry Genova did on the Harvey hotel deal?
3   A.   Fifth.
4   Q.   Did Kim and Tony Wash own clubs in Harvey
5   before Assets?
6   A.   I believe they had two other -- one -- one or
7   two other businesses.
8   Q.   Was one called King of Diamonds?
9   A.   I'm not sure in regards to what name they
10  applied for with the City of Harvey.
11  Q.   Have you ever been in a club called King of
12  Diamonds?
13  A.   I don't visit -- I haven't visit -- I don't
14  recall ever visiting King of Diamonds.
15  Q.   Did you ever go to Assets?
16  A.   I never went to Assets.
17  Q.   Did you ever talk to Kim or Tony Wash about
18  opening a club in Harvey at any time?
19  A.   Best of my recollection, I haven't had a
20  conversation with them pertaining to opening a club in
21  Harvey. They generally go through the planning
22  department.
23  Q.   Did you have any financial interest in
24  Lola Grand?

Page 164

1   A.   No, sir.
2   Q.   Did you help him start Lola Grand?
3   A.   No, sir.
4   Q.   I'm sorry, I should -- your son, did you help
5   your son start it?
6   A.   No.
7   Q.   Did he discuss starting Lola Grand with you?
8   A.   No.
9        MR. WALSH: You know what, we are going to step out
10  for a second and have a quick chat and then we might be
11  done.
12            (A short break was had.)
13  BY MR. WALSH:
14  Q.   Do you know Ricky Graves?
15  A.   Ricky Graves?
16       Yeah, that was Nick Graves' son.
17  Q.   And was he an employee of the City of Harvey?
18  A.   I think he was -- well, I think he owned a tow
19  company.
20  Q.   Okay.
21  A.   Royal Tow Company and I think he was also a
22  police officer.
23  Q.   Okay. And did you cause Nicky (phonetic)
24  Graves to be terminated from Harvey?

Page 165

1   A.   How could I cause anybody to be terminated?
2   Q.   I don't know, you're the mayor. I'm asking
3   you the question. I don't mean to --
4   A.   Right.
5   Q.   -- you know, be facetious, but --
6   A.   I mean, if he was a police officer, he would
7   have to go in front of several boards, I mean, so how
8   could I cause him to be terminated?
9   Q.   Did you cause him to lose the tow contract?
10  A.   How could I -- well, first of all, when a new
11  mayor comes in, as I indicated earlier, it's the
12  prerogative of the mayor to bring in his various
13  appointments.
14  Q.   Including the --
15  A.   Yeah.
16  Q.   -- tow company?
17  A.   It's one of the appointments that he -- the
18  mayor has the prerogative to bring in.
19  Q.   You, you're talking about. When you say the
20  mayor.
21  A.   Yeah.
22  Q.   So when you came in, did Nicky Graves tow
23  company lose their contract with the city and they were
24  replaced with Ed's Towing?

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 12 of 17 PageID #:494

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 166..169

Page 166

1   A.  The best of my recollection, I came in with
2   the two tow companies I had and I can't recall if
3   they -- all the other issues relative to that.
4   Q.  Okay.  Did Ricky Graves file a lawsuit against
5   you?
6   A.  I believe he did.
7   Q.  Okay.  And did the city settle that lawsuit?
8   A.  I believe they did.
9   Q.  Did you give testimony in that lawsuit?
10  A.  I believe I did.
11  Q.  Okay.  And did Ricky Graves allege in that
12  lawsuit that he lost the contract because of his
13  political association with his father?
14  A.  I'm not sure what -- what Ricky gave.
15  Q.  Did -- did Joseph Letke ever talk to you about
16  Jerry Genova's relationship with Satish Gabhawala?
17  A.  I plead the Fifth.
18  Q.  Did Joseph Letke ever tell you -- or strike
19  that.
20      Did you ever tell Joseph Letke to end his
21  relationship with Satish Gabhawala?
22  A.  What --
23  Q.  Satish Gabhawala.
24  A.  Did I tell Joe to end his relationship?

Page 167

1   Q.  Yes.
2   A.  Can I answer --
3   MR. SMITH:  Well, there's a question pending.
4   THE WITNESS:  Right.
5   BY THE WITNESS:
6   A.  Well, no, the Fifth.  That's all.  Yeah, I
7   plead the Fifth.
8   Q.  Okay.  Did Joseph Letke ever tell you that he
9   was representing Satish Gabhawala and the city in the
10  Harvey hotel deal?
11  A.  I plead the Fifth.
12  Q.  Did you ever tell Joe Letke that you were
13  uncomfortable with Jerry working on the Harvey hotel
14  deal?
15  A.  I take the Fifth.
16  Q.  Did you ever tell Joseph Letke to -- or that
17  you didn't want Jerry Genova working at Letke &
18  Associates because of the Harvey hotel deal?
19  A.  I take the Fifth.
20  MR. WALSH:  Nothing further.
21  THE WITNESS:  Okay.
22  MR. SMITH:  My name is Stepfon Smith, I represent
23  Mayor Kellogg as one of the defendants in the matter and
24  I have a few follow up questions for you, Major.

Page 168

1   We are going to take a brief break --
2   MR. WALSH:  Okay.
3   MR. SMITH:  -- and step outside.
4   MR. WALSH:  Take your time.
5       (A short break was had.)
6           EXAMINATION
7   BY MR. SMITH:
8   Q.  Okay.  Mayor Kellogg, regarding political
9   work, is doing political work for you or your campaign a
10  condition of employment for anyone who -- who is seeking
11  employment with the City of Harvey?
12  A.  No, sir.
13  Q.  Okay.  Is doing political work a condition
14  of -- a condition of employment for anyone who's
15  currently employed with the City of Harvey?
16  A.  No, sir.
17  Q.  Okay.  As long as you've been mayor, has been
18  doing political work ever been a condition of employment
19  for anyone that you knew of that's ever been employed
20  with the City of Harvey --
21  A.  No, sir.
22  Q.  -- during your administration?
23  A.  No, sir.
24  Q.  I'm going to talk to you a little bit about

Page 169

1   bills.  There was some testimony about bills from
2   various businesses, in particular, Letke & Associates.
3       Isn't it true that you cannot vote on any
4   bills unless there is a tie between the aldermen?
5   A.  That's true.
6   Q.  Okay.  Can you tell us what -- what the voting
7   procedures are for your position as the mayor in the
8   City of Harvey generally.
9   A.  Generally the only time the mayor can vote on
10  an issue is if there is a tie and I break the tie.  So
11  if it's three to three, then always -- I would break the
12  tie.
13  Q.  Okay.  But unless there's an -- even though
14  you're the mayor --
15  A.  Right.
16  Q.  -- unless there's a tie, you don't have the
17  authority or power to vote on anything, do you?
18  A.  You're absolutely correct, no, I don't.
19  Q.  Regarding Tyrone Rogers, do you know if he was
20  ever charged or convicted criminally in connection with
21  stealing any money from the City of Harvey?
22  A.  Not that I know of.
23  Q.  Okay.  So all of the reports about his -- his
24  potential theft and money from the City of Harvey is

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 13 of 17 PageID #:495

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014
Pages 170..173

Page 170

1  mostly hearsay, right?
2      A.  Yes.
3      MR. WALSH: Object to the form.
4  BY MR. SMITH:
5      Q.  Okay. Regarding finances in the City of
6  Harvey, it sounds like, based on your testimony, that
7  you or someone that you may have designated, implemented
8  some safeguards around misuse of funds, would you -- is
9  that a fair statement?
10     A.  Yes.
11     Q.  Okay. When you learned about the potential or
12 the allegations about Tyrone Rogers stealing money from
13 the City of Harvey, what did you do to correct the
14 situation?
15     A.  Well, there was a meeting held with the chief
16 of police and there was some safeguards put in place
17 with handling any money -- anyone handling money in the
18 City of Harvey. There had to be safeguards put in place
19 and the chief put in place some safeguards.
20     Q.  At this --
21     MR. WALSH: I'm sorry, could you repeat that
22 question?
23              (Record read as requested.)
24

Page 171

1  BY MR. SMITH:
2      Q.  Now, after you learned about the allegations
3  of Tyrone Rogers stealing money from the City of Harvey,
4  did you make sure that he couldn't go over to the Metra
5  and collect any money dependently anymore?
6      A.  Right. Well, and any time there is an
7  allegation regarding anyone that -- you know, there is
8  some allegations surrounding the theft of money,
9  certainly there is going to be safeguards put in place
10 to protect the city from that type of allegation and so
11 certainly if there's any allegation pertaining to anyone
12 with respect to, you know, theft of money, there will
13 be, number one, a safeguard put in place, but more
14 important, if, in fact, it's been proven, they will be
15 terminated and we will report it to the authorities.
16     Q.  Okay. I'm going to ask you some questions
17 about plaintiff, Jerry Genova.
18          The plaintiff is here at this deposition,
19 correct?
20     A.  Yes.
21     Q.  Okay. Sitting right across the table from
22 you, correct?
23     A.  Absolutely.
24     Q.  When's the last time you saw the plaintiff,

Page 172

1  Jerry Genova?
2      A.  I can't -- it's been quite some time. I
3  believe years.
4      MR. WALSH: Excuse me.
5  BY MR. SMITH:
6      Q.  Approximately --
7      A.  If, you know --
8      Q.  Have you ever seen the plaintiff before?
9      A.  Yeah, I've seem him in -- he appears in
10 newspapers and I've seen him on the news and so I have
11 seen him and to see him today just refreshed my memory.
12     Q.  Okay. And have you ever seen him in City Hall
13 at Harvey?
14     A.  I've never seen him at City Hall, no.
15     Q.  Have you ever seen Jerry Genova in the area
16 where Joseph Letke and Maggie Britton work in the City
17 of Harvey?
18     A.  To the best of my recollection, I have never
19 seen him at City Hall or in the area of the
20 comptroller's office.
21     Q.  You -- you do know that -- that the plaintiff
22 here, Jerry Genova, was formally the mayor of the city
23 of Calumet City?
24     A.  Yes, I do.

Page 173

1      Q.  Okay. What were your impressions of
2  Mayor Genova when he was serving in capacity as the
3  Mayor of Harvey -- city of Calumet City?
4      A.  I was always impressed when I would see him in
5  the print or, you know, media. You know, articulate,
6  sharp dresser, he seemed like a nice person.
7      Q.  Did you know the date that Jerry Genova became
8  employed with Joseph Letke & Associates?
9      A.  To the best of my recollection, I have no --
10 no date that I would know when he was hired by
11 Mr. Letke.
12     Q.  Regarding Nick Graves, how -- how did you
13 first come to know Nick Graves?
14     A.  Well, I was born and raised in the City of
15 Harvey so Mayor Graves -- I would see him in the
16 community. He was a baseball couch, he was a patrolman,
17 and then he kind of worked his way up to becoming the
18 chief of police, so throughout my -- my life I would
19 always see, you know, Mayor Graves in various
20 capacities, you know, working with the little league or
21 police officer or things of that nature.
22     Q.  Approximately how old were you when you became
23 to know Nick Graves?
24     A.  I had to be 14, 15. I was quite young.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 14 of 17 PageID #:496

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 174..177

Page 174

1   Q.   Okay.  Around that age, when you were around
2  14, 15, what were your impressions of Mayor Graves at
3  that time?
4   A.   At that time -- when I seen him, I just
5  thought he was a decent person at that time.  I
6  didn't -- you know, I was young and I just saw him
7  involved in the community.
8   Q.   Okay.  Now, when you became involved in Harvey
9  politics as an alderman, did your impression with -- did
10 your impressions of Mayor Graves change at all?
11  A.   When I was an alderman?
12  Q.   Yeah.
13  A.   Well, we had, you know, our political
14 differences, but, you know, besides that, we was
15 always -- you know, besides the politics, it was always
16 a level of respect.
17  Q.   Did you respect him as a politician?
18  A.   I respected him as a politician and as a man.
19  Q.   Okay.  At any time did you become aware of a
20 relationship between plaintiff, Jerry Genova, and
21 Nick Graves?
22  A.   Best of my recollection, I don't recall a
23 relationship between the mayors.
24  Q.   Did you ever know that Jerry Genova and

Page 175

1  Nick Graves knew each other?
2   A.   Best of my recollection, I don't -- I don't
3  recall having -- being privy to that information.  I
4  don't recall to the best of my recollection.
5   Q.   Okay.  Regarding the Nation of Islam, are you
6  a Muslim, Mayor?
7   A.   No, sir, I'm a Christian.
8   Q.   Have you ever been a Muslim?
9   A.   No, sir.
10     MR. SMITH:  I have nothing further.
11     MR. WALSH:  Few follow ups.
12           FURTHER EXAMINATION
13 BY MR. WALSH:
14  Q.   Mayor, your counsel asked you on cross about
15 all the, quote, reports you received about Tyrone
16 alledgedly stealing and you said, yes, that those were
17 hearsay; do you remember that testimony?
18  A.   I think he was going off the question that you
19 asked.
20  Q.   Well, he said to you all the reports that you
21 received of the alleged stealing were hearsay and you
22 said yes.
23  A.   No, I said -- if -- if you can play it back,
24 when he asked the question -- when he raised the

Page 176

1  question -- my question was anyone associated with
2  stealing, you know, that would be --
3     MR. WALSH:  Do you have -- can you read back that
4  question?  It was right in the beginning.
5         The keyword might be hearsay; I don't know if
6  you can check it by that.
7     MS. COURT REPORTER:  I probably could.
8         (Record read as requested.)
9  BY MR. WALSH:
10  Q.   Okay.  So what reports --
11  A.   And --
12  Q.   -- were you -- did you answer yes to?
13       In other words, what reports of his alleged
14 stealing did you receive?
15  A.   Any -- no, just -- it was hearsay by -- I just
16 answered the question.  The question was:  Was there any
17 reports relative to Tyrone and he said it was hearsay
18 and I was just agreeing.
19  Q.   Okay.  So what reports did you receive of
20 alleged theft by Tyrone?
21  A.   Again, there's no documented reports relative
22 to Tyrone Rogers stealing.
23  Q.   What information -- what information did you
24 receive in any form that alleged Tyrone Rogers was

Page 177

1  stealing from the Metra lot?
2   A.   I have no documented evidence -- concrete
3  evidence from anyone who gave me a written report
4  stating that Tyrone Rogers had ever stole from Metra.
5   Q.   Anyone tell you that verbally?
6   A.   In regards to Tyrone Rogers stealing and they
7  actually saw it?
8   Q.   No.
9   A.   What?
10  Q.   Did allegation -- did anyone verbally make an
11 allegation to you that Tyrone Rogers was stealing from
12 Metra?
13  A.   I can't recall anyone telling me that
14 Tyrone Rogers was stealing.  I can't recall.
15  Q.   What about the meeting you had with
16 Chief Eaves?
17  A.   That was regarding putting in place safety
18 measures to address any -- anyone handling money.
19  Q.   And at that time did Chief Eaves tell you that
20 he suspected Tyrone Rogers was stealing from the Metra
21 lot?
22  A.   I don't recall Chief Eaves ever making that
23 statement.  I can't recall that.
24  Q.   Did you ever ask anyone to investigate whether

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 15 of 17 PageID #:497

Genova vs. City of Harvey  
Eric Kellogg - 07/31/2014  
Pages 178..181

**Page 178**

1  Tyrone Rogers was stealing from the Metra parking lot?
2  A.  I can't recall ever asking anyone.
3  Q.  Did you ever ask anyone to check the Metra
4  receipts?
5  A.  I can't recall.
6  Q.  Did you ever report these suspicions to law
7  enforcement?
8  A.  I can't recall reporting any -- you know,
9  anything relative to Mr. Rogers to law enforcement.
10  Q.  Okay.  You testified you didn't see
11  Jerry Genova at City Hall, correct?
12  A.  I said to the best of my recollection, I can't
13  recall seeing him.
14  Q.  Okay.  But earlier you testified that you
15  didn't see Joe Letke much either, correct?
16  A.  I said due to the fact that I was working at
17  the school --
18  Q.  You didn't --
19  A.  I didn't see him that often.
20  Q.  Okay.  And you don't doubt that Joe Letke
21  worked at City Hall, right?
22  A.  I don't doubt that Joe Letke was a comptroller
23  who would come into City Hall to handle business with
24  the department heads.

**Page 179**

1  Q.  Other than Joe Letke, Maggie Britton and
2  Gloria --
3  A.  Uh-huh.
4  Q.  -- did you see any other employees of Letke &
5  Associates at City Hall?
6  A.  Let me see.
7      Yes, yeah.  I saw one other accountant and I
8  can't even think of the guy's name, but he's an
9  accountant.
10  Q.  You were asked some questions about your
11  relationship with Nick Graves.
12  A.  Uh-huh.
13  Q.  Did your relationship deteriorate during the
14  first campaign?
15  A.  I wouldn't say deteriorate, but we had a --
16  some political differences.
17  Q.  And what were those political differences?
18  A.  He was mayor and I was running for mayor.
19  Q.  So it was -- was it the fact that you two were
20  running against each other that caused political
21  differences?
22  A.  I think that -- that could be safe -- a safe
23  assumption.
24  Q.  Okay.  Did you ever have any arguments with

**Page 180**

1  Nick Graves?
2  A.  I had a lot of arguments -- well, debates.
3  Spirited debates.
4  Q.  Formal debates or informal?
5  A.  It was spirited debates at the city council.
6  Q.  Okay.  Fair to call them arguments?
7  A.  Spirited debates.
8  Q.  Okay.  Raise your voice?
9  A.  Spirited debates.
10  Q.  Okay.  Does that cover raising voices?
11  A.  I'll just call it spirited debates.
12  Q.  Okay.
13  A.  Difference of opinions.
14  Q.  Did Nick Graves ever call you any names?
15  A.  Like, you know, he probably has in the past.
16  Q.  Derogatory names.  I mean rude names.
17  A.  He probably has in the past.
18  Q.  And did you ever call him any derogatory or
19  rude names?
20  A.  I can't recall.
21  Q.  Did Jerry Genova ever do any political work
22  for you?
23  A.  I don't recall Mr. Genova doing any work for
24  me.

**Page 181**

1  Q.  Okay.  Did you ever see him at any of your
2  campaign offices?
3  A.  I don't recall ever seeing Mr. Genova.
4  Q.  Okay.  Do you know whether Mr. Genova ever
5  made any political contributions to you?
6  A.  I'm not sure.  I can't recall if he did make
7  any political contributions.
8      MR. GENOVA:  I need to see you briefly before you
9  conclude.
10     MR. WALSH:  I'm really sorry.  One minute.  I don't
11  have anything else right now.
12     THE WITNESS:  Okay.
13     MR. WALSH:  I'm very sorry, Counsel.
14     MR. SMITH:  That's okay.
15         (A short break was had.)
16     MR. WALSH:  Okay.  Two couple small questions here.
17     THE WITNESS:  Okay.
18     MR. WALSH:  Are you ready?
19  BY MR. WALSH:
20  Q.  Okay.  Did Nick Graves ever call you a
21  pedophile at a board meeting?
22  A.  A pedophile?
23  Q.  Yeah, did he ever refer to you as a pedophile
24  at a board meeting?

Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 16 of 17 PageID #:498

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 182..185

Page 182

1  A.  I don't recall him ever calling me a
2  pedophile.
3  Q.  Did he ever call you a boy lover?
4  A.  I can't recall him ever calling me a boy
5  lover.
6  Q.  Okay.  One way or the other, you don't recall?
7  A.  I don't -- well, first of all, number one, it
8  wouldn't be true.
9  Q.  Well, I know, I'm not --
10 A.  Okay.  But I don't recall him ever --
11 Q.  Just to be clear --
12 A.  -- being that -- yeah, I can't --
13 Q.  I'm not alleging that it's true --
14 A.  Right.
15 Q.  -- or even trying to suggest that it's true --
16 A.  Right.
17 Q.  -- I'm just trying to get to the nature of the
18 relationship.
19 A.  No, I can't recall him ever, you know,
20 stooping that low --
21 Q.  Yeah.
22 A.  -- to say that.
23 Q.  That's inappropriate for a board meeting --
24 A.  Yeah.

Page 183

1  Q.  -- I want you to know that.
2  A.  Yeah.
3  Q.  I'm not suggesting that.
4  A.  Yeah, I can't -- I can't recall him --
5  Q.  Okay.  Did he ever call you any racially
6  derogatory terms?
7  A.  I can't recall if he ever has.  I can't
8  recall.
9  Q.  Okay.  Do you -- was there ever a story in the
10 newspaper that you recall about him saying something
11 racially derogatory?
12 A.  I can't recall.
13 MR. WALSH:  Okay.  All right.
14          Nothing further.
15 MR. SMITH:  Nothing.
16 MR. WALSH:  I'll order it.
17 MS. COURT REPORTER:  Signature?
18 MR. SMITH:  Oh, Mayor, a couple of ways of handling
19 this, you can waive signature and if you waive
20 signature, you will be assuming that the court reporter
21 took down your testimony accurately.
22         You can reserve signature and have the
23 opportunity to review the transcript.  You will sign
24 what's called an errata sheet and send it back to the

Page 184

1  court reporter and this is usually done within 30 days.
2          So it's your decision.  If you want to take a
3  look at the transcript, I'd be happy to come out to
4  Harvey and sit down with you and look over it.
5  THE WITNESS:  Yeah.
6  MR. SMITH:  Okay.  So you want to waive or reserve?
7  THE WITNESS:  Waive so we can all take a look at
8  it.
9  MR. SMITH:  Okay.  We will reserve signature.
10 MR. WALSH:  All right.
11          (Witness excused.)

Page 185

1          IN THE UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION
4  JEROME P. GENOVA,              )
                                  )
5          Plaintiff,             )
                                  )
6       vs.                       ) No. 12 CV 3105
                                  )
7  ERIC KELLOGG; JOSEPH LETKE;    )
   LETKE & ASSOCIATES, INC., and  )
8  the CITY OF HARVEY             )
                                  )
9          Defendants.            )

10     I, ERIC KELLOGG, state that I have read the
11 foregoing transcript of the testimony given by me at my
12 deposition on July 31st, 2014, and that said transcript
13 constitutes a true and correct record of the testimony
14 given by me at the said deposition except as I have so
15 indicated on the errata sheets provided herein.

                                   _____
                                         ERIC KELLOGG

SUBSCRIBED AND SWORN to
Before me this _____ day
of _____, 2014.

_____
     NOTARY PUBLIC



Case: 1:12-cv-03105 Document #: 112-3 Filed: 08/21/14 Page 17 of 17 PageID #:499

Genova vs. City of Harvey
Eric Kellogg - 07/31/2014

Pages 186..188

Page 186

1  UNITED STATES OF AMERICA      )
   NORTHERN DISTRICT OF ILLINOIS )
2  EASTERN DIVISION              ) SS.
   STATE OF ILLINOIS             )
3  COUNTY OF COOK                )
4          I, Jori Gardner, Certified Shorthand Reporter,
5  do hereby certify that ERIC KELLOGG was first duly sworn
6  by me to testify to the whole truth and that the above
7  deposition was reported stenographically by me and
8  reduced to typewriting under my personal direction.
9          I further certify that the said deposition was
10 taken at the time and place specified and that the
11 taking of said deposition commenced on July 31st, 2014,
12 at 10:19 a.m.
13         I further certify that I am not a relative or
14 employee or attorney or counsel of any of the parties,
15 nor a relative or employee of such attorney or counsel,
16 nor financially interested directly or indirectly in
17 this action.

Page 187

1          In witness whereof, I have hereunto set my
2  hand and affixed my seal of office at Chicago, Illinois,
3  this 15th day of August, A.D., 2014.

10         JORI GARDNER, CSR
           180 North LaSalle Street
11         Suite 2800
           Chicago, Illinois  60601
12         Phone:  (312) 236-6936

   CSR No.  084-004671

Page 188

1  Errata Sheet
2
3  NAME OF CASE: Genova vs. City of Harvey
4  DATE OF DEPOSITION: 07/31/2014
5  NAME OF WITNESS: Eric Kellogg
6  Reason Codes:
7      1. To clarify the record.
8      2. To conform to the facts.
9      3. To correct transcription errors.
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____
24
                        _____
                          (Signature)

